MCA FINANCIAL CORPORATION v GRANT THORNTON, LLP

Docket No. 244972. Submitted July 20, 2004, at Detroit. Decided July 29, 2004, at 9:00 A.M. Leave to appeal sought.

MCA Financial Corporation and others, brought an action for damages in the Oakland Circuit Court against Grant Thornton, L.L.P, and Doeren Mayhew & Company, P.C., claiming that the defendant auditors were aware of, or should have discovered, accounting irregularities in the plaintiffs' financial statements and that, had the irregularities been exposed earlier, the plaintiffs' insolvency would have been detected earlier and financial losses related to insolvency would have been less severe. The court, Denise K. Langford-Morris, J., granted summary disposition for the defendants on the basis of its determination that the wrongful conduct of several corporate officers of the plaintiffs could be imputed to the plaintiffs, and that the plaintiffs cannot recover on a claim based on their own wrongful conduct. The plaintiffs appealed.

The Court of Appeals *held*:

1. Under the wrongful-conduct rule, a plaintiff is precluded from recovering on a claim that is premised on the plaintiff's wrongful conduct or where both the plaintiff and the defendant participated equally in the wrongful conduct. Michigan courts apply the wrongful-conduct rule to ensure that (1) courts will not condone wrongful conduct by rewarding a guilty party, (2) wrongdoers will not profit or be compensated by their wrongful conduct, (3) the public will not view the legal system as a mockery of justice, and (4) wrongdoers will not shift responsibility for their illegal acts to others. In this case, granting relief to the plaintiffs would in effect condone their agents' wrongdoing, would compensate the plaintiffs for their agents' wrongdoing, and would also have the responsibility for their wrongdoing shifted to the defendants. To the extent there are innocent investors of the plaintiffs who would be the beneficiaries of any recovery, and who might have viable claims against the defendants and against whom the wrongful-conduct rule would not be applicable, that does not preclude application of the rule to the plaintiffs.

2. The trial court correctly determined that the fraudulent acts of the plaintiffs' corporate officers could be imputed to the plain-

tiffs. The officers' fraudulent acts were in the course of employment and were for the benefit of the plaintiffs. The plaintiffs cannot avail themselves of the "adverse interest" exception to the general rule of imputation in the absence of a showing that the corporate officers acted solely in their own interests and against the plaintiffs' interests.

Affirmed.

GAGE, J., concurred in the result only.

ACTIONS — WRONGFUL CONDUCT RULE — IN PARI DELICTO.

A plaintiff is precluded from recovering on a claim that is based on his own wrongful conduct or where the plaintiff and the defendant participated equally in the wrongful conduct.

*Bodman, Longley & Dahling LLP* (by *James J. Walsh, Alan N. Harris,* and *Matthew T. Jane*) for the plaintiffs.

*Law Offices of John A. Libby, P.C.* (by *John A. Libby*), and *Cohen & Grigsby, P.C.* (by *Richard R. Nelson, II,* and *Larry K. Elliott*), for Grant Thornton, L.L.P.

*Young & Susser, P.C.* (by *Rodger D. Young, Steven Susser,* and *Terry Milne Osgood*), for Doeren Mayhew & Company, P.C.

Before: SAWYER, P.J., and GAGE and OWENS, JJ.

SAWYER, P.J. In this case, we are asked to address the question whether a corporation may recover damages from its auditors where the auditors certified what proved to be false financial statements and the corporation subsequently went into bankruptcy. We agree with the trial court that the wrongful conduct of individual corporate officers may be imputed to the corporations, thus precluding the corporations from maintaining an action against the auditors. Because it is undisputed that various corporate officers engaged in such wrongdoing and plaintiffs present no evidence to

establish a genuine issue of material fact to support application of the adverse interest exception to the imputation rule, we affirm the trial court's grant of summary disposition in favor of defendants.

Plaintiff MCA Mortgage Corporation, a mortgage bank, was founded in the mid-1980s. In the 1990s, plaintiff MCA Financial Corporation was created to serve as the holding company of MCA Financial and subsidiaries, including plaintiffs Mortgage Corporation of American and RIMCO Realty and Mortgage. Although started as a traditional mortgage banking business, the MCA group expanded into subprime mortgage lending, land contract syndication, loan servicing, and real estate sales. According to plaintiffs, by the end of 1998, the MCA group had over 900 employees and branch offices in ten states, and was the largest owner of residential real estate in Detroit other than the city itself.

In addition to investments by shareholders, MCA formed investment "pools" for investments in land contracts. Investment certificates were sold through securities dealers that sold interests in a group of land contracts and made quarterly distributions to the investors as the land contract payments were received. According to plaintiffs, over 150 such pools, most with an initial value of $1 million, had been organized by the time of the corporation's collapse.

The MCA group ceased operations on January 22, 1999, and terminated its employees and officers. The following week, the Financial Institutions Bureau seized plaintiffs and appointed a conservator. Thereafter, MCA filed voluntary petitions in bankruptcy court. The instant action was instituted by the liquidating agent. According to plaintiffs' brief, the losses of the investors and lenders approach $200 million.

Both state and federal law enforcement officials brought criminal charges against various officers of plaintiffs, alleging various securities fraud and other charges arising out of plaintiffs' operations. Some, but not all, of MCA's board members have been implicated in the wrongdoing. These investigations have resulted in criminal convictions.

At the risk of oversimplifying the factual background, the improprieties in this case arise out of how transactions between MCA and its subsidiaries were reflected on the financial statements, resulting in a misstatement of plaintiffs' financial condition. At the heart of plaintiffs' allegations against defendants is the claim that defendants were aware of, or should have discovered, the accounting irregularities in the financial statements and should have disclosed these irregularities to MCA's board of directors. Plaintiffs further argue that, had the irregularities been exposed earlier by defendants, MCA's insolvency would have been detected no later than 1994, which would have reduced the magnitude of the financial losses suffered by MCA's collapse.

Given the procedural posture of this case, we shall assume, without deciding, that plaintiffs can, in fact, factually establish that there were accounting irregularities, that defendants knew of (or could have detected) those irregularities, and that, had defendants disclosed these irregularities upon discovery, the financial losses suffered by the MCA insolvency would have been less. But even with these assumptions, we are not persuaded that the trial court erred in granting summary disposition in favor of defendants.

The trial court's grant of summary disposition is based on two principles. First, that the wrongful conduct of some of MCA's officers can be imputed to the

corporation and, second, that the corporation cannot recover based on its own wrongful conduct. We agree with the trial court that the officers' conduct may be imputed to the corporation and, therefore, defendants may successfully raise the wrongful-conduct defense.

As the Supreme Court explained in *Orzel v Scott Drug Co*,[1] Michigan follows the wrongful-conduct rule, which precludes a plaintiff from recovering on a claim that is based on the plaintiff's own wrongdoing:

> When a plaintiff's action is based, in whole or in part, on his own illegal conduct, a fundamental common-law maxim generally applies to bar the plaintiff's claim:
>
> "[A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transactions to which he is a party. [1A CJS, Actions, § 29, p 386. See also 1 Am Jur 2d, Actions, § 45, p 752.]"
>
> When a plaintiff's action is based on his own illegal conduct, and the defendant has participated equally in the illegal activity, a similar common-law maxim, known as the "doctrine of in pari delicto" generally applies to also bar the plaintiff's claim:
>
> "[A]s between parties in pari delicto, that is equally in the wrong, the law will not lend itself to afford relief to one as against the other, but will leave them as it finds them. [1A CJS, Actions, § 29, p 388. See also 1 Am Jur 2d, Actions, § 46, p 753.]"

*Orzel*[2] went on to explain the rationale behind the wrongful-conduct rule:

> The rationale that Michigan courts have used to support the wrongful-conduct rule are [sic] rooted in the public policy that courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct.

---

[1] 449 Mich 550, 558; 537 NW2d 208 (1995).

[2] *Id.* at 559-560.

*Manning* [*v Bishop of Marquette,* 345 Mich 130, 133; 76 NW2d 75 (1956)]. *Glazier* [*v Lee,* 171 Mich App 216, 220; 429 NW2d 857 (1988)]. If courts chose to regularly give their aid under such circumstances, several unacceptable consequences would result. First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct. [*Miller v*] *Radikopf* [394 Mich 83, 89; 228 NW2d 386 (1975)]. Second, some wrongdoers would be able to receive a profit or compensation as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice. Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties.

See also *Ameriwood Industries Int'l Corp v Arthur Andersen & Co*[3] (applying the *in pari delicto* doctrine under Michigan law in an accounting malpractice case).

In the case at bar, plaintiffs' claims are based on the wrongful conduct of certain officers of the corporation. Indeed, that conduct has resulted in criminal convictions. Therefore, if that illegal conduct of the officers can be imputed to the corporation itself, then the wrongful-conduct rule could apply to bar recovery by plaintiffs against defendants. Before reaching the question whether that illegal conduct can be imputed to the corporation, plaintiffs offer other arguments why the wrongful-conduct rule should not be applied.

First, plaintiffs argue that this case differs from *Orzel* with respect to the nature of the conduct of the defendants in the two cases. In *Orzel,* the defendant acted negligently in filling otherwise valid prescriptions; that is, that the defendant's pharmacist should have recognized that the plaintiff was abusing a drug that had been prescribed and should have either refused to fill the prescription or at least alerted the

---

[3] 961 F Supp 1078 (WD Mich, 1997).

plaintiff's family to the situation. In the case at bar, plaintiffs argue that defendants affirmatively told plaintiffs' management that it was proper to report, as plaintiffs' brief describes it, "sham assets" and "bogus revenues" in the financial statements. That is, plaintiffs argue that defendants in this case affirmatively engaged in wrongdoing, while in *Orzel* the defendant was merely negligent in failing to act. We disagree with plaintiffs' argument for two reasons.

Initially, we note that, while plaintiffs' brief argues that defendants affirmatively told plaintiffs' management that it was proper to report the transactions with the subsidiaries as they did, that is not how the matter was pleaded in the complaint. That is, while plaintiffs now argue a theory of liability based on what defendants allegedly did, the complaint speaks in terms of what defendants failed to do. The failure to act theory contained in the complaint is essentially the same theory of liability as in *Orzel* that liability is premised on the failure to do something. Thus, while plaintiffs correctly note that it was not alleged in *Orzel* that the defendant had affirmatively urged the plaintiff to use the prescribed drug, or even reported to the plaintiff's family that all was well, the same can be said of the allegations in the case at bar. Plaintiffs' complaint does not allege that defendants affirmatively counseled plaintiffs to report the transactions in the financial statements in the manner in which they were reported or even, upon a request for advice, counseled plaintiffs that all was well with the manner in which the transactions were reported. At most, the complaint alleges that defendants failed to detect the defects in the financial statements and, therefore, erroneously put their seal of approval on the financial statements as being acceptable. We fail to see a meaningful distinction between this set of facts and that of a pharmacist filling

a prescription (an affirmative act in and of itself) after failing to detect that there was something wrong with the customer's use of a prescribed drug.

But, even if we view defendants' certifying of the financial statements as an affirmative act distinguishable from the passive act in *Orzel*, this leads us to our second point, that defendants' misconduct is, at most, on par with plaintiffs, and therefore the *in pari delicto* rule applies to preclude recovery. That is, perhaps plaintiffs could potentially prevail if they could show that the wrongdoers within their organizations believed, based on defendants' affirmative advice, that the manner in which the transactions were structured and reported on the financial statements were proper. But plaintiffs make no such showing, nor even such an allegation. Because plaintiffs cannot show that the wrongdoing occurred at defendants' urging or affirmative advice, plaintiffs stand *in pari delicto* with defendants. In short, to prevail, plaintiffs would have to show more than that defendants turned a blind eye to plaintiffs' wrongdoing, but that defendants' active wrongdoing was greater than was plaintiffs' wrongdoing. But that is not the case here; there is no showing that the scheme originated with defendants rather than with plaintiffs.

Next, plaintiffs argue that the wrongful-conduct rule should not apply because none of the "unacceptable consequences" listed in *Orzel*[4] would occur here if the wrongful-conduct rule was not applied. We disagree. We begin by noting that the *Orzel* Court was explaining the rationale behind the wrongful-conduct rule and was not establishing a requirement that at least one of the four listed public policy concerns must be present in order to apply the rule. But even so, we believe that at least

---

[4] 449 Mich 559-560.

three of the four public policy concerns listed in *Orzel* would be present here if we failed to apply the wrongful-conduct rule. First, granting relief to plaintiffs would in effect condone the wrongdoing. While it is true, as plaintiffs point out, that the individual wrongdoers are facing criminal sanctions for the actions, we would nevertheless be condoning the corporations' involvement by allowing plaintiffs to recover losses generated by their agents' own illegal conduct. We would, in essence, be sending the message that companies can safely ignore their employees' behavior as we will allow them to shift the burden to the auditors for not detecting it. Second, if plaintiffs did not profit from their own illegal acts, they certainly would be compensated for the wrongdoing if we allowed the losses to be recovered from defendants. Indeed, this overlaps with the first concern as we would, in essence, encourage the wrongdoing. And third (the fourth concern listed in *Orzel*), plaintiffs will be able to shift responsibility for their wrongdoing to defendants. For that matter, even the remaining concern under *Orzel*, whether the public would view the legal system as a mockery of justice if plaintiffs are allowed to prevail, is at best a neutral one. While it may be, as plaintiffs suggest, that the public would view it as a mockery to allow defendants to escape the consequences of their involvement in this matter, it is at least equally possible that the public would view it as a mockery that we would allow the active fraudfeasors (plaintiffs) to prevail against defendants who merely committed malfeasance.

Plaintiffs do raise an interesting point that the actual individual wrongdoers would not be benefiting from any recovery from defendants, but that the liquidating agent would disburse any recovery among plaintiffs' innocent investors. This is not an inconsequential point; indeed, it has served a role in many of the

decisions cited by plaintiffs. Ultimately, however, we are not persuaded that it is one that should affect the application of the wrongful-conduct rule if the actions of the individual wrongdoers are imputed to plaintiffs. That is, while innocent investors may have been harmed, that would not change the fact that the corporation is treated as having engaged in wrongdoing and, therefore, its investors should not profit from that wrongdoing. In making an investment, an investor makes a judgment on whether the company can make a profit and share that profit with its investors. And when a company goes bankrupt, the investor loses his investment. That is true regardless of the reason for the company's failure. While an innocent company that is harmed by others' wrongdoing may be able to recover damages and recoup its investors' losses, we see no basis for guaranteeing the recoupment of losses by investors whose company engaged in wrongdoing. Ultimately, by making an investment in a company, an investor is casting a vote of confidence in the management of that company.

Furthermore, this action is brought in the name of the corporations, not the individual investors. So the question before this Court is not whether the individual investors are entitled to recover, but whether the corporations are so entitled. And we hold that, under the wrongful-conduct rule, they are not. Although we need not and do not decide whether defendants owed a duty to the individual investors, and whether defendants are liable to those individual investors for breaching that duty, it may well be that they are so liable. But, if that is the case, then the action would have to be brought by the individual investors themselves, not by the corporations. Because the individual innocent investors themselves are free of wrongdoing, the wrongful-conduct rule would not bar recovery by them in an

action brought in their own names. Again, we are not holding that such an action would be viable, only that for such an action to be viable it would have to be brought by the innocent investors themselves, not by the corporations.

Next, plaintiffs argue that defendants had a duty to ensure, through the audit process, that the financial statements were free of material misstatements. That may well be true, but that does not affect the application of the wrongful-conduct rule. That is, the wrongful-conduct rule is not limited to situations where the defendant is innocent of wrongdoing, either intentional or negligent. Rather, its premise is that, while the defendant engaged in negligence or intentionally wrongful conduct, because the plaintiff also engaged in wrongful conduct, recovery is precluded. Again, the true question is whether, on the basis of any failures by defendants, the individual investors would be able to maintain the action directly.[5] And that question is not before us.

Plaintiffs do raise an interesting analogy to *Longstreth v Gensel*.[6] In *Longstreth*, the plaintiffs' underage son was served alcohol and was subsequently killed in a motor vehicle accident. Despite the obvious wrongdoing by the plaintiffs' decedent, recovery was allowed against the social host who provided the alcohol. While *Orzel*[7] does point to *Longstreth* as an example of a case in which the plaintiff's conduct does not preclude recovery, a closer examination of *Longstreth* discloses some important distinctions. First, the liability in *Long-*

---

[5] We do note that defendant Grant Thornton points out in its brief that, under MCL 600.2962, the individual investors could not maintain such an action. We need not determine whether that observation is correct.

[6] 423 Mich 675; 377 NW2d 804 (1985).

[7] *Id.* at 561.

*streth* was premised on statutory and even constitutional violations that were designed to protect a certain class of citizens, specifically minors who presumably cannot make sound judgments with respect to the consumption of alcohol. That is, the restrictions on underage drinking are premised on the idea that the minor must be protected from his own foibles by those who control the supply of alcohol. We do not see a similar analogy that corporations are inclined by immaturity to engage in accounting fraud and auditors have a statutory duty to prevent corporations from producing fraudulent financial statements. Second, and more importantly, *Longstreth*[8] specifically noted that an adult consumer of alcohol, generally, is precluded from recovery for his own injuries after extensive consumption of alcohol, and that the decision in *Longstreth* was specifically limited to cases in which minors are furnished alcohol. Therefore, at best, we could conclude from *Longstreth* that the exception to the wrongful-conduct rule should apply to minors and that is not the case here.

For the above reasons, we conclude that the wrongful-conduct rule does operate to bar recovery in this case provided that the wrongful conduct of the individual corporate officers may be imputed to the corporations themselves. For the reasons discussed below, we conclude that the trial court correctly determined that such an interpretation can be made.

The parties agree that the fraudulent acts of a corporate officer may be imputed to a corporation where those acts (1) are in the course of employment and (2) are for the benefit of the corporation. *Official Committee of Unsecured Creditors v R F Lafferty & Co,*

---

[8] *Id.* at 685-686.

*PC.*[9] As *Unsecured Creditors*[10] explains, the second part of the test is often analyzed in light of the adverse interest exception. Under this exception, the corporate officer's actions will not be deemed to have been done for the benefit of the corporation if the actions were adverse to the corporation's interests. That is, the acts were done for the actor's own benefit. *Hoekzema v Van Haften;*[11] see also *Nat'l Turners Bldg & Loan Ass'n v Schreitmueller.*[12] Furthermore, it is generally recognized that the adverse interest exception does not apply where an agent is acting even in part on behalf of the principal; for the exception to apply, the agent must be acting solely in his own interest and against the interest of his principal. *Allard v Arthur Andersen & Co.*[13]

In *Allard,* the parties disagreed over whether Michigan or New York law should apply to the dispute. The court made the following observation:

> Under New York law, the "adverse interest" exception does not apply "when the agent acts both for himself and the principal, though his primary interest is inimical to the principal." *In re Crazy Eddie* [*Securities Litigation,* 802 F Supp 804, 817 (ED NY, 1992)]; [*Center v*] *Hampton Affiliates,* 66 NY2d [782, 785; 497 NYS2d 898, 900; 488 NE2d 828 (1985)]. It does not appear that any Michigan court has specifically considered this question, but there is no reason to believe that a Michigan court would depart from the New York and Restatement rule that the adverse interest exception is not triggered if the agent is acting at least in part to further the principal's interest. Restatement (Second) of Agency § 282 cmt c (1957); Matthew G. Dore, Presumed Innocent? Financial Institutions, Professional

---

[9]  267 F3d 340, 358 (CA 3, 2001).

[10]  *Id.* at 359.

[11]  313 Mich 417, 426; 21 NW2d 183 (1946).

[12]  288 Mich 580, 586; 285 NW 497 (1939).

[13]  924 F Supp 488, 495 (SD NY, 1996).

Malpractice Claims, and Defenses Based on Management Misconduct, 1995 Colum Bus L Rev 127, 161 (1995) ("The courts appear to agree that adverse interest should be determined by a corporate agent's motives, rather than the outcome of his activities, and that if the agent acts for the benefit of the corporation at least in part, the adverse interest exception does not apply"). [*Allard, supra* at 495.]

There still does not appear to be any published Michigan opinion that would disagree with the general rule.[14] Accordingly, the question becomes whether plaintiffs can show that the corporate wrongdoers were acting solely in their own self-interest and contrary to the interests of the corporations. Further, it must be kept in mind that it is the wrongdoers' motives, not results, that are determinative. In this respect, plaintiffs' arguments focus on the results, not the motivations. That is, plaintiffs point to the fact that the fraudfeasors' conduct ultimately resulted in the collapse of MCA and its subsidiaries. But the fact that the wrongdoers' conduct proved harmful to the corporations does not settle the question. The adverse interest exception will not apply if the wrongdoers' motivation was not entirely for personal gain at the expense of the corporations, but was, even in part, a misguided belief that their wrongdoing would benefit the corporations. While plaintiffs are correct that the issue of motivation is one of fact, they must nevertheless present some evidence to create a genuine issue of fact on this point. In this regard, they point to no evidence that would establish that the individual wrongdoers were not acting, at least in part, out of a motivation of keeping the corporations afloat, and thus provide a benefit to the corporations.

Indeed, this is why plaintiffs' reliance on the "deep-

---

[14] This Court did recently, in an unpublished opinion, apply the general rule. See *Transnation Title Ins Co v Livingston*, unpublished opinion per curiam, issued February 3, 2004 (Docket No. 243509).

ening insolvency" theory is ultimately of no benefit to plaintiffs. The deepening insolvency theory recognizes that prolonging a corporation's operations may increase its insolvency and thereby further deplete the value of the corporation. Courts have recognized this as a viable theory of liability on which to base an action for harm against a corporation. See *Unsecured Creditors, supra.* But that merely recognizes that the corporation's interests were, in fact, harmed. It does not establish that the wrongdoer's motive was to harm the corporation. Thus, in the case at bar, while the deepening insolvency theory might provide a basis for recovery by plaintiffs if they can get past the wrongful-conduct rule, it does not provide a basis to invoke the adverse interest exception because it does not provide a basis for determining the wrongdoers' motivations.

Plaintiffs also argue that they should be permitted to avoid the imputation doctrine because this action was brought by the liquidating agent following a bankruptcy filing rather than by a corporation that was not in bankruptcy. We disagree. Plaintiffs point to the decisions in *FDIC v O'Melveny & Myers,* but we do not find those decisions persuasive. First, the Ninth Circuit Court of Appeals decided, applying federal law, that the wrongdoing of corporate officers would not be imputed to the plaintiff, as receiver for a failed savings and loan association, in its suit against a law firm for legal malpractice. *FDIC v O'Melveny & Myers.*[15] Thereafter, the Supreme Court reversed, concluding that state law controlled whether the corporate officers' actions would be imputed to the FDIC as receiver. *FDIC v O'Melveny & Myers.*[16] On remand, the Ninth Circuit, this time applying California law, concluded that corporate wrongdo-

---

[15] 969 F2d 744 (CA 9, 1992).

[16] 512 US 79, 85-89; 114 S Ct 2048; 129 L Ed 2d 67 (1994).

ing would not be imputed to a trustee, receiver, or other innocent entity that steps into a corporation's position pursuant to a court order. *FDIC v O'Melveny & Myers*.[17] While that may be the case under California law, it is not, as discussed above, the case under Michigan law.

Plaintiffs also rely on the federal court's decision in *Scholes v Lehmann*.[18] We find that decision unpersuasive for two reasons. First, it applies Illinois law, not Michigan law. Second, it involves recovering a fraudulent conveyance, not maintaining a tort action. That is, if the defendants were not fraudfeasors themselves, they directly profited from the fraud. This is similar to the situation in *In re Latin Investment Corp*,[19] which also sought to recover monies transferred to the defendant.

Moreover, plaintiffs' reliance on *In re Jack Greenberg*[20] is misplaced. The Bankruptcy Court in that case recognized that it must apply state law and reached its conclusion on the basis of its determination of what would be the correct result under Pennsylvania law.[21] Indeed, if anything, the *Greenberg* case reaffirms our conclusion in this case—that all indications are that Michigan law would apply the imputation doctrine, as discussed above. In this respect, the case that is most on point is *Allard*. That case was brought by a bankruptcy trustee (Mr. Allard was the bankruptcy trustee for the DeLorean Motor Company) against the bankrupt's former auditors in a securities fraud action and the court endeavored to apply Michigan law. As discussed above, the court determined that Michigan law would

[17] 61 F3d 17, 19 (CA 9, 1995).

[18] 56 F3d 750 (CA 7, 1995).

[19] 168 BR 1 (DC, 1993).

[20] 240 BR 486 (ED Pa, 1999).

[21] *Id.* at 501.

apply the imputation doctrine and that the adverse interest exception would be recognized only if the corporate wrongdoers acted solely in their own interest and entirely against the interests of the corporation. Thus, *Allard*, not *Scholes* or *Greenberg*, provides the best guidance in this case.

Additionally, plaintiffs' reliance on *Comeau v Rupp*[22] is misplaced because that case determined that, because the action was brought by the FDIC, federal law applied and the result was specific to the fact that that action was brought by the FDIC. Similarly, the decision in *Schact v Brown*[23] is inapplicable because that was based on application of federal law under the Racketeer Influenced and Corrupt Organizations Act.[24]

Another decision relied on by plaintiffs, *Phar-Mor, Inc v Coopers & Lybrand*,[25] provides little benefit to plaintiffs' position. First, the decision was based primarily on the determination that there existed a genuine issue of material fact regarding whether the corporate wrongdoers acted solely in their own interest and, therefore, whether the adverse interest exception should apply.[26] Second, the part of the opinion relied on by plaintiffs is more of an observation than a holding, with the court noting that it would be the creditors of the corporation, not the wrongdoers, who would benefit from any recovery. Moreover, in making this observation, the court relied on the subsequently reversed decision by the Ninth Circuit in *O'Melveny, supra*.

Finally, plaintiffs look to the decision in *In re Sharp Int'l Corp*[27] for the proposition that a corporate officer's

---

[22] 810 F Supp 1127 (D Kan, 1992).

[23] 711 F2d 1343 (CA 7, 1983).

[24] 18 USC 1961 *et seq*.

[25] 900 F Supp 784 (WD Pa, 1995).

[26] *Id.* at 786-787.

[27] 278 BR 28 (ED NY, 2002).

fraud will not be imputed to the corporation, thus allowing the bankruptcy trustee to proceed with his claim, where there exists at least one innocent decision maker who, if he had been alerted to the fraud, could have stopped it. Plaintiffs' reliance on this case is misplaced. First, *Sharp* relied on New York law, not Michigan law. Second, we read *Sharp* as recognizing an exception to the sole actor rule, rather than as establishing a general principle (and plaintiffs already argued in their brief that the sole actor rule does not apply).

The sole actor rule is an exception to the adverse interest exception, which as discussed above, is an exception to the rule of imputing the wrongful conduct of a corporate officer to the corporation. The sole actor rule comes into play where the wrongdoer is, in essence, the corporation (the "sole actor"). Indeed, it has its roots in cases where the agent and the principal are literally the same person (literally a "sole actor") and thus information obtained by a person in his role as an agent is treated as also being obtained in his role as principal, even if his activities as agent are contrary to his interests as a principal. See *In re Mediators, Inc.*[28] Therefore, where the wrongdoer acts contrary to the interests of the corporation, under the adverse interest exception the wrongdoer's conduct would not ordinarily be imputed to the corporation. But where the wrongdoer is a sole actor, the adverse interest exception is not applied and his wrongdoing is nevertheless imputed to the corporation. For example, where a sole shareholder loots the corporation of its assets, the adverse interest exception will not apply. See *In re Mediators.*[29] The

---

[28]  105 F3d 822, 827 (CA 2, 1997), citing Renschlein & Gregory, The Law of Agency and Partnership, § 64, p 121 (2d, 1990).

[29]  *Id.* at 827.

decision in *Sharp* recognizes, in essence, that where there is an innocent decision maker, the wrongdoer cannot be a sole actor and, therefore, the adverse interest exception will apply.

In short, even if we were to follow the *Sharp* decision, that would only mean that we would not apply the sole actor rule to impute the wrongdoers' actions to the corporations. But we have not applied the sole actor rule in our analysis, therefore we need not consider whether to apply the *Sharp* exception to the sole actor rule.

In sum, we conclude that the wrongful-conduct rule will apply to preclude plaintiffs from recovery against defendants if the actions of the corporate wrongdoers may be imputed to the corporations. Because it is undisputed that various corporate officers did engage in wrongful conduct, in order for plaintiffs to prevail they must show that that conduct should not be imputed to the corporations. To be able to avoid the imputation of that conduct to the corporations, plaintiffs must show that the wrongdoers were acting adversely to the interests of the corporations. And that determination will be measured by the motives of the wrongdoers, not whether their actions in fact resulted in harm to the corporations. Accordingly, summary disposition in favor of defendants is appropriate if there is no available evidence, when viewed in the light most favorable to plaintiffs, to create a genuine issue of material fact on this point. *J & J Farmer Leasing, Inc v Citizens Ins Co of America.*[30] While there is evidence to suggest that the wrongdoers were acting under the belief, perhaps misguided, that their actions were benefiting the corporations by keeping them afloat, plaintiffs point to no evidence that the wrongdoers were motivated by self-

---

[30] 260 Mich App 607, 610; 680 NW2d 423 (2004).

interest to the exclusion and knowing detriment of the interests of the corporations. Defendants argue that the wrongdoers enjoyed no benefit from prolonging the existence of the corporations beyond their own continued employment, a benefit that was shared by nine hundred other employees who were not involved in the wrongdoing; and plaintiffs point to no evidence to dispute this conclusion.

Affirmed. Defendants may tax costs.

OWENS, J., concurred.

GAGE, J., I concur in the result only.