NEW PROPERTIES, INC v GEORGE D NEWPOWER, JR, INC

Docket No. 280153. Submitted January 7, 2009, at Grand Rapids. Decided January 20, 2009, at 9:05 a.m.

New Properties, Inc., and Robert W. and Harriet Kitchen brought an action in the Grand Traverse Circuit Court against George D. Newpower, Jr., Inc., doing business as Hansen Realty, Lakes of the North Realty, Inc., George D. Newpower, Jr., Muriel Hart, Huntington National Bank, and others, seeking damages resulting from the embezzlement of funds by George D. Newpower, Jr. The court, Philip E. Rodgers, Jr., J., awarded the plaintiffs damages in the amount of $1.8 million against Hart and Huntington National Bank, jointly and severally. The court also granted summary disposition in favor of Lakes of the North and dismissed the Kitchens' claims against Lakes of the North. Hart and the bank appealed and the plaintiffs cross-appealed. The Court of Appeals, DAVIS, P.J., and SAWYER and SCHUETTE, JJ., affirmed in part, reversed in part (including the order of summary disposition in favor of Lakes of the North), and remanded for proceedings consistent with its opinion. Unpublished opinion per curiam of the Court of Appeals, issued September 14, 2006 (Docket No. 259932). On remand, the trial court entered a $300,000 judgment in favor of the plaintiffs against Lakes of the North Realty (three times the amount of the plaintiffs' actual damages of $100,000) and awarded attorney fees and costs to the plaintiffs. The attorney fees and costs did not include appellate attorney fees and costs. Lakes of the North appealed, and the plaintiffs cross-appealed.

The Court of Appeals *held*:

1. The legal determinations in the prior appeal of this case amount to a finding that Lakes of the North is liable on the basis of its imputed knowledge of the money transfer. The prior appeal established that this knowledge could not be imputed to New Properties. This law of the case was properly applied by the trial court on remand in finding Lakes of the North liable and requiring it to pay damages to the Kitchens.

2. MCL 600.2919a provides for treble damages for the concealment of stolen, embezzled, or converted property. The trial court

properly calculated and assessed against Lakes of the North treble damages as a penalty with regard to its liability for a $30,000 deposit.

3. The trial court properly awarded the Kitchens $300,000 in treble damages for the $100,000 actual damages they sustained. The treble damages are not to be awarded in addition to the actual damages sustained.

4. MCL 600.2919a permits the recovery of postjudgment fees related to this appeal. The judgment must be affirmed, but the case must be remanded for the entry of an amended judgment that includes the Kitchens' postjudgment fees and costs and appellate fees and costs.

Affirmed and remanded for the entry of an amended judgment regarding the award of fees and costs.

1. DAMAGES — TREBLE DAMAGES — STOLEN, EMBEZZLED, OR CONVERTED PROPERTY.

An award of treble damages pursuant to the statute governing damages for the concealment of stolen, embezzled, or converted property is calculated by multiplying the amount of actual damages by three; an award of treble damages is not calculated by adding the amount of actual damages to the amount determined by multiplying the amount of actual damages by three (MCL 600.2919a).

2. COSTS — ATTORNEY FEES — POSTJUDGMENT ATTORNEY FEES — APPELLATE ATTORNEY FEES — STOLEN, EMBEZZLED, OR CONVERTED PROPERTY.

Postjudgment attorney fees and costs, including appellate fees and costs, may be awarded under the statute that governs damages for the concealment of stolen, embezzled, or converted property (MCL 600.2919a).

*Bowerman, Bowden, Ford, Clulo & Luyt, P.C.* (by *Gregory M. Luyt*), for the plaintiffs.

*Calcutt Rogers & Boynton, PLLC* (by *Jack E. Boynton*), for Lakes of the North Realty, Inc.

Before: BECKERING, P.J., and WHITBECK and M. J. KELLY, JJ.

PER CURIAM. This case stems from a prior appeal in this Court, *New Properties, Inc v Newpower* (*New*

*Properties I*).[1] This present matter is an appeal from the trial court's decision on remand from *New Properties I*. Defendant Lakes of the North Realty, Inc., appeals as of right the trial court's judgment setting forth monetary damages payable to plaintiffs Robert W. Kitchen and Harriet Kitchen. We affirm, but remand for the entry of an amended judgment consistent with this opinion.

## I. BASIC FACTS AND PROCEDURAL HISTORY

No further facts were entered into the record on remand to the trial court. Thus, we quote verbatim the facts as set forth in *New Properties I*:[2]

*Introduction*

George Newpower, Jr. (Newpower) was a prominent businessperson in the northern Michigan village of Mancelona. In 1996, Newpower embezzled $755,000.00 from plaintiffs Robert and Harriet Kitchen (the Kitchens), his business partners. In 1997, plaintiffs sued Newpower and the various recipients of the embezzled funds. Plaintiffs also sued the Bank and its Mancelona branch Manager Muriel Hart (Hart) for conversion under the Uniform Commercial Code (UCC) alleging that the Bank and Hart knowingly allowed and, in fact, facilitated the embezzlement. Newpower eventually pleaded guilty to embezzlement of over $100 and was sentenced to 6-10 years in prison.

*Newpower and the Mancelona Community*

Newpower moved to Mancelona in 1976 and purchased Hansen Realty, a local real estate agency. For the next twenty years, Newpower's agency was actively engaged in the real estate business. Newpower formed another real estate company in 1994, Lakes of the North Realty, [Inc.,] which managed vacation rental properties in the area.

---

[1] *New Properties, Inc v Newpower*, unpublished opinion per curiam of the Court of Appeals, issued September 14, 2006 (Docket No. 259932).

[2] *Id.* at 2-7.

Newpower was the Principal Broker with Lakes of the North, served as its President, Vice President, Director, Chief Executive Officer and Chief Operating Officer and was the sole signatory of its trust accounts at the bank. Newpower kept the bank accounts for his business ventures at the Antrim County State Bank, where Muriel Hart was "his banker." Newpower helped recruit, FMB Northwestern State Bank[1] ("the Bank") to Mancelona and he recommended Hart to the Bank as an experienced and well-respected banker in the community who could bring them immediate business. Hart then opened the new branch in Mancelona as its manager. Newpower then moved his personal and business accounts to the Bank.

*The Mancelona Area Health Clinic Scandal*

Newpower was also president and a member of the board of directors of the Mancelona Area Health Clinic (MHC). Hart, too, was involved in the operation of the MHC, acting as the treasurer. In September 1993, Newpower suggested that $30,000 of MHC's money deposited into an account at the Bank could earn more interest in an investment account of his choosing. Upon taking the money from the MHC account, however, Newpower did not invest it but rather deposited it into his personal account at the Bank for his own uses. The money was eventually discovered to have been used by Newpower to make a $1400.74 mortgage loan payment to the Bank, a $165.30 personal loan payment to Hart, and a $91.67 personal loan payment to Hart and her mother.

In January or February 1995, Hart became suspicious of Newpower's investment of the money as she had not received any statements about its performance. As early as March 1995, she pulled copies of Newpower's accounts and determined that he had deposited the money into his personal account rather than investing it. Hart testified that she sought the advice of the Bank's Senior Lender, Daniel Spagnuolo, who told her to investigate the matter and seek the advice of Jack McKaig, an attorney on the MHC board. Spagnulo [sic] initially testified that he "may"

have been told by Hart that Newpower had deposited the money in his personal account, but later testified that she did not mention this fact.

David Brooks, [an] MHC Board member, also was concerned with the whereabouts of the money. He was told by Newpower that the investment was made with "Munson & Madison Financial Service Corp.," a Chicago investment firm, because they had a "means of pooling moneys" to get better interest rates. The Munson & Madison investment firm was fictitiously created by Newpower to attempt to hide his embezzlement. Thus, when Brooks inquired with Munson Hospital, he was unsuccessful in discovering the location of the funds. The first mention of the "investment" in MHC's records was not until February 16, 1995, when Hart recorded that Newpower had invested the money at Munson & Madison Financial Service Corp. and that Newpower reported the account was paying 8.65% and he had given instructions for the investment firm to send Hart statements and tax information. The only statement ever received was fraudulently created by Newpower, and Hart never received any tax information regarding the investment.

The money mysteriously reappeared after this series of inquiries. A check was issued from Munson & Madison to refund the investment; however, the check was not written on a Chicago investment firm account but rather [an] NBD Bank in Traverse City. Newpower created the NBD account solely to deposit embezzled money and to subsequently issue the fraudulent Munson & Madison check. The account at NBD was only open for five days. When MHC was made whole, all other inquiries into the use of the money were dropped.

*Newpower and the Kim Biehl scandal*

Kim Biehl was Newpower's secretary at Lakes of the North. Her husband, James Biehl, worked for Newpower at Hansen Realty. In August 1994, Mrs. Biehl discovered that checks she had written were bouncing because a check that Newpower had given to her husband for a commission had been dishonored. Mrs. Biehl went to the small Mancelona

branch of the Bank and complained loudly, asserting that the only way Newpower's check could have bounced from the trust account it was written on was if he was "cooking the books." This information was apparently communicated to Hart, although she was not in the Bank at the time. Hart later stated that she regarded the accusation as "hearsay."

*Newpower and the Bank*

*Newpower and Muriel Hart's banking relationship*

Muriel Hart had 26 years of banking experience. Hart was Newpower's banker for both his business endeavors[,] as well as his personal finances. When Newpower recruited the Bank to come to Mancelona, he personally recommended Hart as a qualified manager to run the new business. Hart continually practiced lenient banking procedures with regards to Newpower's various accounts. Hart often held checks to prevent overdrafts from occurring in Newpower's accounts until he could deposit funds to cover the check. More than once, Hart sat down and went extensively through Newpower's accounts to determine why his balance showed different amounts than the Bank's balance of his accounts. When Hart inquired as to why certain deposits were made to certain accounts, Newpower often replied that the secretary must have deposited into the wrong account, yet Hart never fixed such errors.

In addition to this banking relationship, Newpower and Hart had been friends for many years. Hart had personally loaned $12,000.00 to Newpower and had also arranged for her mother to loan him $10,000.00. Additionally, Hart lent approximately $28,800.00 to the corporation Newpower ran with Jerry [sic] Biehl, Mancelona Properties, Inc. [MPI]. Personally, financially and professionally, Hart and Newpower were closely connected.

*Newpower and his other accounts at the Bank*

Newpower had eight other accounts at the Bank for his own personal finances, as well as for his real estate business ventures with Lakes of the North, Hansen Real Estate[sic], and MPI. Each of these accounts experienced

significant overdrafts from 1993 to 1996. In particular, the trust accounts for the Mancelona trailer park that Newpower managed through Hansen Realty, as well as the trust accounts for Lakes of the North, experienced overdrafts despite the fact that they should not have been used to withdraw monies. In total, there were approximately 288 overdrafts in these accounts in this short three year period.

Newpower also had a $42,000.00 line of credit with the Bank. When Dan Spagnuolo took his position as Senior Lender at the Bank, one of his jobs was to reduce the outstanding debts of its customers. In 1994, Spagnuolo met with Newpower and reviewed his overdraft history with him. Spagnuolo advised Newpower that unless he paid in full his great debts to the Bank, his line of credit would not be renewed because of Newpower's breach of both trust and contractual agreements. Without explanation, Newpower paid off this large debt to the Bank within a month of this correspondence with Spagnuolo.

*Muriel Hart and the Bank*
*Overdraft review responsibilities*

As manager of the Bank, Hart's job included ensuring that the bank's financial security controls were implemented to protect the bank from fraudulent and criminal activity. Specifically, Hart was responsible for reviewing the daily overdraft report and deciding which overdrafts to pay and which ones to refuse. Despite Newpower's extensive overdraft history, Hart continually paid out his checks when his funds were insufficient. In particular, in March 1996, three of Newpower's checks were returned for insufficient funds. After Newpower transferred the majority of a wire transfer from plaintiffs from the NPI [New Properties, Inc.] account into his personal account, the bank cleared the three returned checks and paid them on the same day. No explanation could be given as to how this could occur on the same day in a small bank without direct intervention by a bank employee. Ironically, Newpower also wrote a check to Hart for his loan payment to her on the same day.

*Other bank responsibilities*

The Bank's procedures for managing its accounts requires [sic] a series of progressive disciplinary steps that begin with warning letters and end with the closing of an account. While the bank manager does have some discretion, in the end it is the manager's job to ensure that such fraudulent activities do not occur. To implement this, the Bank had clear policies and procedures to follow for monitoring suspicious activities of its customers. Suspicious activities include excessive overdrafts and large numbers of fund transfers between accounts and the unexplained and sudden pay-off of problem loans. While Hart often discussed her concerns about Newpower's management of his accounts with him, she never closed any of his accounts at the Bank nor flagged his activities as suspicious to the bank's other employees.

*Newpower and the Kitchens*

*The formation of NPI*

In 1995, the Kitchens decided to sell their interest in their potato farm to Robert Kitchen's brother, William.[2] Around the same time, Newpower and the Kitchens formed a property development business called New Properties, Inc. (NPI). The Kitchens and Newpower had a former business relationship through the Kitchens' potato farm. After forming NPI, the Kitchens moved to Alaska, leaving Newpower in charge. Newpower and the Kitchens were to each own 50% of the shares in the new company, and for each deposit the Kitchens made, Newpower was to deposit an equal amount into an NPI bank account. When Newpower opened the NPI account, Muriel Hart, the bank's manager, was involved. Newpower told Hart that he was going into business with the Kitchens and also told her that NPI was to have the same business model as MPI, Newpower's other real estate business venture. Newpower thus had broad authority to endorse, sign and draw checks on NPI's account. Newpower was the only signatory authority on the NPI account.

*The embezzlement from NPI*

In January 1996, Harriet Kitchen delivered Newpower two checks, one for $200,000.00 and another for $2,000.00. The former check was made out to Newpower personally and was intended as the payment for the Kitchens' half of a 320 acre parcel of land in Kalkaska (as indicated in the memo section of the check) while the latter check was made out to NPI and was intended as the payment for the Kitchens' shares of stock in NPI. Newpower took the Kitchens' checks to the bank and deposited the $200,000.00 check into his personal account. The $2,000.00 check was eventually used to open an account for NPI at the Bank in February 1996.

After Newpower deposited the Kitchens' $200,000.00 check into his personal account in January, he later made two deposits from his personal account into two Lakes of the North accounts at the bank. No other deposits were made into Newpower's personal account between the deposit of the plaintiffs' $200,000.00 check and Newpower writing the checks subsequently deposited into Lakes of the North's accounts. Thus, the source of the two deposits into the Lakes of the North accounts by Newpower was the plaintiffs' $200,000.00 check.

Additionally, about a month later, Newpower made a third deposit into a Lakes of the North account by directly transferring the funds from the NPI corporate account into the Lakes of the North account. All deposits into the NPI account were from the Kitchens. Thus, the third deposit into the Lakes of the North account was entirely plaintiffs' funds.

From February through October of 1996, the Kitchens made six wire transfers from their new home in Alaska to the NPI account, totaling $638,250. Newpower never matched any of these funds as he agreed to do when he formed NPI with Robert Kitchen. Robert Kitchen testified that with the first two or three wire transfers he called and personally talked to Hart to verify that they were going into the NPI account. Hart also testified that she was

aware of the wire transfers coming from the Kitchens and that she had personally handled at least one for $220,000.00.

*The discovery of the embezzlement*

The Kitchens corresponded with Newpower on a regular basis. Robert Kitchen spoke with him on the phone twice a week. The Kitchens would wire their half of the money needed to buy the property Newpower claimed to be purchasing. While they did not receive the property deeds they requested, this was consistent with their previous dealings with Newpower, which had not resulted in any negative transactions. The Kitchens did admit that they did not ask [for] or receive regular statements for the NPI bank account.

In December 1996, the Kitchens discovered that Newpower was embezzling their funds. They reported the behavior to the Michigan State Police, who then issued an order to freeze Newpower's accounts. Only the NPI corporate account was frozen, leaving Newpower's personal account open, and resulting in the loss of an additional $10,000.00. By pursuing all the beneficiaries of Newpower's largess, plaintiffs have recovered approximately $248,000.00 of their stolen funds.

*Procedural history*

During the proceedings, defendants filed three motions for summary disposition that were denied. Plaintiffs also filed a motion for partial summary disposition as to claims against defendant Lakes of the North Realty that was denied.

In its order and final judgment, the trial court found that the Bank, through Hart, had actual knowledge of Newpower's fraud and failed to exercise due diligence with notice of that fraud. The Bank was held liable for conversion of plaintiffs' funds. However, under MCL 440.4704, plaintiffs' failed to exercise ordinary care with respect to unauthorized orders of Newpower, and thus were not awarded interest on their recovery. Plaintiffs were, however, awarded treble damages under MCL 600.2919a. The

trial court found that in the absence of a clearly expressed legislative intent to repeal MCL 600.2919a, the statutory treble damage remedy must remain effective and that it was not inconsistent with the actual damage remedy provided by the UCC. The court declined to engage in a negligence analysis, and stated that since it was not awarding damages based upon negligence, it also declined to consider issues of contributory or comparative negligence. The court entered judgment against the Bank and Hart jointly and severally in the amount of $1,840,393.66.

---

[1] FMB Northwestern State Bank is now known as The Huntington National Bank.

[2] Newpower also embezzled $220,000 from the [sic] Robert and William Kitchen's farming business that was discovered after the discovery of the embezzlement from NPI.

---

We additionally note that, before trial, the trial court granted Lakes of the North's motion for summary disposition and dismissed with prejudice the Kitchens' claims against Lakes of the North, reasoning as follows:

> If Newpower's knowledge that the funds were stolen from New Properties and being used to repay Lakes of the North can be imputed to Lakes of the North, the same rationale would cause that knowledge to be imputed to New Properties. Yet, no one seriously argues that New Properties countenanced Newpower's thefts from Lakes of the North or authorized the disbursements to Lakes of the North from its accounts. . . . There are no legal or equitable grounds that would entitle New Properties to recover against Lakes of the North.

After the trial, the Kitchens appealed the grant of summary disposition to Lakes of the North. This Court reversed the trial court's order, holding as follows:

> [T]he actual deposits of the money into the [Lakes of the North] accounts were within the scope of [Newpower's]

employment [with Lakes of the North]. Additionally, he was in no way privileged not to disclose or act upon the knowledge he had that the funds were embezzled from plaintiffs. Thus, the knowledge of Newpower is considered the knowledge of Lakes of the North.[3]

This Court went on to state, "Lakes of the North should be liable for fraudulent conduct of Newpower" and stated that the Kitchens are entitled to treble damages, interest, attorney fees, and costs pursuant to MCL 600.2919a.[4] The case was affirmed in part, reversed in part, and remanded for the entry of a judgment consistent with the ruling.

On June 15, 2007, the trial court issued both an order and final judgment against Lakes of the North, granting the Kitchens treble damages in the amount of $300,000, and attorney fees and costs in the amount of $4,000. Lakes of the North now appeals.

## II. "IMPUTED KNOWLEDGE" AND THE LAW OF THE CASE

### A. STANDARD OF REVIEW

Lakes of the North argues that the trial court failed to properly comply with the decision in *New Properties I* because it did not apply the doctrine of imputable knowledge to *both* Lakes of the North and to New Properties. According to Lakes of the North, the trial court should have deemed the delivery of money to Lakes of the North to have been known by the Kitchens. Under this approach, Lakes of the North was equally a victim of Newpower's embezzlement scheme and should not be liable to the Kitchens, because they are both equally worthy of blame, or equally innocent, and because both parties knew about Newpower's actions.

---

[3] *New Properties I, supra* at 21.

[4] *Id.*

Lakes of the North submitted objections to the Kitchens' proposed judgment, raising this issue in the trial court and thus properly preserving this issue.[5] This Court reviews de novo the application of the law of the case as established by this Court in a prior appeal.[6]

### B. THE LAW OF THE CASE DOCTRINE

" 'The law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue.' "[7] " '[I]f an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same.' "[8]

### C. THE RULING IN *NEW PROPERTIES I*

In *New Properties I*, this Court affirmed in part, reversed in part, and remanded for the entry of an order in accordance with its legal ruling. There was no change in, or addition to, the facts as established in the trial court record. Thus, we are bound by the law of the case, as established in *New Properties I*, and may not decide the previously determined legal questions differently. It is therefore necessary to set forth exactly how the legal questions were determined in *New Properties I*.

---

[5] See *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999).

[6] *City of Kalamazoo v Dep't of Corrections (After Remand)*, 229 Mich App 132, 134-135; 580 NW2d 475 (1998).

[7] *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 91; 662 NW2d 387 (2003) (citation omitted).

[8] *Grievance Administrator v Lopatin*, 462 Mich 235, 259; 612 NW2d 120 (2000) (citation omitted).

As the Kitchens point out, the *New Properties I* decision stated many times that Lakes of the North is liable to them for Newpower's actions:

[1.] The trial court erred in finding that Lakes of the North Realty was not liable to plaintiffs for Newpower's actions. . . .

\* \* \*

[2.] Here, the Lakes of the North held plaintiffs' money subject to plaintiffs' interest. By refusing to return the money to plaintiffs, Lakes of the North has accepted Newpower's act as their own and must therefore be held liable for the conversion of plaintiffs' property.

\* \* \*

[3.] Lakes of the North still has plaintiffs' money and thus in taking the gains of Newpower's fraud, it must also take the consequences of it. Lakes of the North should be liable for the fraudulent conduct of Newpower.

\* \* \*

[4.] In sum, Lakes of the North is liable for the fraudulent conduct of Newpower.

\* \* \*

[5.] The trial court also erred in finding that Lakes of the North was not liable for the fraudulent conduct of Newpower.[9]

Lakes of the North does not acknowledge these repeated statements. It focuses solely on this Court's statement that "the doctrine of imputed knowledge is applicable to this case."[10]

---

[9] *New Properties I, supra* at 20, 21, 24.

[10] *Id.* at 20.

D. THE DOCTRINE OF IMPUTED KNOWLEDGE

The doctrine of imputed knowledge generally provides:

> When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing[,] [acquire] while acting under and within the scope of their authority.[11]

Lakes of the North argues that, because the doctrine applies, it must be applied to both it and New Properties so that each is imputed with the knowledge of Newpower's actions, the two are equal victims, and neither is liable. In our prior decision, this Court did not expressly discuss the application of the doctrine of imputed knowledge in connection with New Properties. However, this Court did note that Newpower "acted outside of the scope of his authority with regards to NPI by embezzling plaintiffs' money and converting it for his own use."[12]

This Court thus applied a recognized exception to the doctrine of imputed knowledge, the "adverse interest" exception. "The general rule which imputes an agent's knowledge to his principal is subject to an exception where the agent acts in his own interest, adversely to his principal."[13] Here, Newpower was acting adversely

---

[11] *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 214; 476 NW2d 392 (1991) (quotation marks and citations omitted).

[12] *New Properties I, supra* at 21.

[13] *Nat'l Turners Bldg & Loan Ass'n v Schreitmueller*, 288 Mich 580, 586; 285 NW 497 (1939). See also *MCA Financial Corp v Grant Thornton, LLP*, 263 Mich App 152, 164; 687 NW2d 850 (2004).

to the Kitchens' interests by embezzling money from them and therefore his knowledge cannot be imputed to New Properties.

For these reasons, we conclude that the legal determinations in *New Properties I* amount to a finding that Lakes of the North is liable on the basis of its imputed knowledge of the money transfer. We also conclude that *New Properties I* established that this knowledge is *not* imputed to New Properties. This is the law of the case, which the trial court applied properly, finding Lakes of the North liable and requiring it to pay damages to the Kitchens.

### III. DAMAGES

#### A. STANDARD OF REVIEW

Lakes of the North argues that the Kitchens improperly recovered damages multiple times against two parties for one injury and, therefore, that Lakes of the North should not be required to pay $90,000 to the Kitchens. Lakes of the North submitted objections to the Kitchens' proposed judgment, raising this issue in the trial court and properly preserving this issue.[14] This Court reviews de novo the application of the law of the case as established by this Court in a prior appeal.[15]

#### B. FACTUAL PREDICATE

On January 5, 1996, Newpower deposited the Kitchens' $200,000 check into his personal account, which then had an initial balance of $32.67. On February 9, 1996, he transferred $30,000 from his personal account to Lakes of the North. Undoubtedly, this sum was the

---

[14] See *Fast Air, supra* at 549.

[15] *City of Kalamazoo, supra* at 134-135.

Kitchens' money. In *New Properties I*, this Court held defendants Northwestern State Bank and Hart liable to the Kitchens.[16]

### C. MCL 600.2919a

At the time relevant to this appeal (the Legislature amended this statute during the course of the litigation; the statutory language we quote here is the applicable version of the statute that was valid during the course of the embezzlement), MCL 600.2919a provided:

> A person damaged as a result of another person's buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property when the person buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees. This remedy shall be in addition to any other right or remedy the person may have at law or otherwise.

### D. CONSTRUING THE STATUTE

The rules of statutory construction include the following:

> The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. The first step in determining legislative intent is to review the language of the statute itself. If the statute is unambiguous, the Legislature is presumed to have intended the meaning expressed and judicial construction is neither required nor permitted. However, if reasonable minds can differ concerning the meaning of a statute, judicial construction of the statute is appropriate.[17]

---

[16] *New Properties I, supra* at 11-12, 17-18.

[17] *Solution Source, Inc v LPR Assoc Ltd Partnership*, 252 Mich App 368, 372-373; 652 NW2d 474 (2002) (citations omitted).

Lakes of the North does not assert that the Kitchens have in fact recovered the full award of damages for which it is jointly and severally liable. Rather, Lakes of the North refers to one episode of embezzlement and suggests that it not share in liability for that episode. But *New Properties I* explicitly held that Lakes of the North shared liability along with Hart and Northwestern State Bank. That holding now stands as the law of the case. Lakes of the North thus shares in liability for the $30,000 deposit to which it refers.

Moreover, in accordance with MCL 600.2919a, the Kitchens are entitled to recover treble damages in addition to their other remedies. The trial court assessed treble damages against Lakes of the North as a *penalty*, not as a single award of damages. The purpose of this award extended beyond restoring the Kitchens to their original condition. The award was intended to *penalize* Lakes of the North. Thus, the trial court properly assessed $90,000 against Lakes of the North in this particular situation. That another defendant may have paid such a sum is immaterial, given that Lakes of the North does not assert that its own payment of such an amount would cause the Kitchens to recover more than their total damages award.

### E. THE $300,000 AWARD OF DAMAGES

In their cross-appeal, the Kitchens argue that the trial court failed to properly apply the triple damages statute when it failed to award treble damages *in addition* to the single award of damages. The Kitchens raised the issue of damages in their proposed final judgment, thus preserving this issue for appellate re-

view.[18] Statutory interpretation is a question of law, which this Court reviews de novo.[19]

Once again, at the time relevant to this case, MCL 600.2919a provided as follows:

> A person damaged as a result of another person's buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property when the person buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees. *This remedy shall be in addition to any other right or remedy the person may have at law or otherwise.* [Emphasis added.]

The Kitchens focus on the language in the last sentence of the statute to argue that the treble damages of $300,000 shall be *in addition to* the remedy of $100,000 to which they are entitled. However, the statutory language unambiguously states that a person "may recover 3 times the amount of actual damages sustained . . . ." It does not state that a person may recover four times the amount. The last sentence means that the remedy of "3 times the amount of actual damages sustained" is in addition to any other remedy, at law or otherwise, such as an equitable remedy or damages. Michigan's trial courts typically award only three times the actual damages sustained when awarding treble damages and the Kitchens have cited no authority for this Court to change this practice. We therefore affirm the trial court's grant of treble damages in the amount totaling $300,000.

---

[18] See *Fast Air, supra* at 549.

[19] *Detroit v Ambassador Bridge Co*, 481 Mich 29, 35; 748 NW2d 221 (2008).

IV. POSTJUDGMENT ATTORNEY FEES AND COSTS

A. STANDARD OF REVIEW

In their cross-appeal, the Kitchens argue that their entitlement to attorney fees and costs should include the amount incurred in this appeal because MCL 600.2919a does not explicitly exclude recovery for appellate or any other fees and costs. The Kitchens, in their proposed final judgment, requested attorney fees and costs incurred in collecting the judgment, thus preserving this issue for appellate review.[20] Statutory interpretation is a question of law that this Court reviews de novo.[21]

B. THE "AMERICAN RULE"

"Under the American rule, attorney fees generally are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award."[22] Here, MCL 600.2919a allows for the recovery of "costs and reasonable attorney's fees."

In *Haliw v Sterling Hts*,[23] the Supreme Court examined the nature of the court rule at issue, MCR 2.403(O)(6), and determined that the prevailing party was not entitled to appellate fees and costs because the rule focused on trial-related costs and case evaluation sanctions. Conversely, however, MCL 600.2919a does *not* focus on trial proceedings to the exclusion of appellate proceedings. It simply refers to "costs and reasonable attorney's fees." Thus, the statute (1) is broadly

---

[20] See *Fast Air, supra* at 549.

[21] *Ambassador Bridge Co, supra* at 35.

[22] *Haliw v Sterling Hts*, 471 Mich 700, 707; 691 NW2d 753 (2005).

[23] *Id.* at 706.

structured, (2) does not explicitly include any limitations on an award of costs and reasonable attorney fees, and (3) contains language expressly authorizing such an award of costs and reasonable attorney fees.

### C. CONSTRUING THE STATUTE

The rules of statutory construction require us to ascertain whether the language of MCL 600.2919a is ambiguous in setting forth legislative intent.[24] Because the statute does not explicitly authorize or prohibit the recovery of postjudgment attorney fees, we must look beyond the words of the statute to discern its meaning.

In *Solution Source, Inc v LPR Assoc Ltd Partnership*,[25] this Court held that, under the Construction Lien Act, MCL 570.1101 *et seq.*, appellate fees, and fees associated with postjudgment collection, are recoverable because the act does not specifically exclude them. The Court pointed out that there were several situations where it had ruled similarly. It stated:

> [T]his Court has determined in numerous other cases that attorney fees for services rendered in connection with appellate proceedings are recoverable under similarly worded statutes that likewise allow for the recovery of attorney fees and do not restrict the recovery to attorney fees incurred at the trial level. See *Leavitt v Monaco Coach Corp*, 241 Mich App 288, 311-312; 616 NW2d 175 (2000) (appellate fees recoverable under the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, 15 USC 2301 *et seq.*); *Grow v W A Thomas Co*, 236 Mich App 696, 720; 601 NW2d 426 (1999) (appellate attorney fees recoverable under the Civil Rights Act, MCL 37.2101 *et seq.*); *Bloemsma v Auto Club Ins Ass'n (After Remand)*, 190 Mich App 686, 689-691; 476 NW2d 487 (1991) (appellate attorney fees available under Michigan's no-fault act, MCL

---

[24] *Solution Source, Inc, supra* at 372-373.

[25] *Id.* at 374-375.

500.3148 [1]); *Escanaba & L S R Co v Keweenaw Land Ass'n, Ltd*, 156 Mich App 804, 818-819; 402 NW2d 505 (1986) (appellate attorney fees available under the Uniform Condemnation Procedures Act, MCL 213.51 *et seq.*, even though the statute only allows recovery for expenses incurred in defending against the improper acquisition of the property at issue).

Therefore, because the Construction Lien Act does not specifically limit recovery of attorney fees incurred before a judgment[,] and in keeping with the purpose of attorney fee provisions, we hold that the Legislature intended that appellate and postjudgment attorney fees would be recoverable under the statute.[26]

The same reasoning applies here. We conclude that MCL 600.2919a permits the recovery of postjudgment fees related to this appeal. Moreover, as we have already stated, unlike the statute at issue in *Haliw*, the statute applicable here does not specifically focus on trial-related costs. We therefore remand this case to the trial court for entry of an amended judgment that includes the Kitchens' postjudgment fees and costs and appellate fees and costs.

Affirmed, but remanded for entry of an amended judgment that includes the Kitchens' postjudgment fees and costs, and appellate fees and costs.

---

[26] *Solution Sources, supra* at 374-375. See also *Smolen v Dahlmann Apartments, Ltd*, 186 Mich App 292, 297-298; 463 NW2d 261 (1990) (appellate attorney fees available under the Michigan Consumer Protection Act, MCL 445.901 *et seq.*).