NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0200n.06

No. 10-1211

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Feb 21, 2012*

LEONARD GREEN, Clerk

JAMES F. CHANDLER, SR., individually and as )
personal representative of the Estate of Janet )
Chandler, deceased estate of Janet Chandler, )
 )
 Plaintiff-Appellant, )
 )
 v. )
 )
WACKENHUT CORPORATION, THE, )
 )
 Defendant-Appellee. )

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

---

BEFORE: DAUGHTREY, COLE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. This diversity action arises from the horrific abduction, rape, and murder of Janet Chandler at the hands of the employees of defendant Wackenhut Corporation in 1979. Janet's murder remained unsolved until 2006, when one of the perpetrators confessed. Plaintiff James Chandler, Janet's father, brought this action for negligent hiring and supervision against Wackenhut in 2008. The district court dismissed the action as untimely and James appeals. There is no question that the facts underlying this case shock the conscience. However, the dismissal was proper because this action was filed outside Michigan's limitations period, Wackenhut did not fraudulently conceal the action, and Michigan has abrogated both the common law discovery rule and extrastatutory equitable tolling in the statute-of-limitations context.

**I.**

In October 1978, the workers at a chemical plant in Holland, Michigan went on strike. The chemical plant hired Wackenhut to provide security to protect the plant's property and its non-striking workers. R. 30 at 3. As a result, approximately seventy out-of-town Wackenhut security guards became temporary residents of the Blue Mill Inn motel, where Janet Chandler worked as the overnight front desk clerk. *Id.* Sexual relationships allegedly formed between motel employees and the security guards, resulting in jealously directed at Janet. *Id.* at 3-4. Several guards and motel employees conspired to "teach Janet Chandler a lesson," by abducting her and assaulting her both sexually and physically. *Id.* at 4. On January 31, 1979, the conspirators handcuffed and abducted Janet. They brought Janet to the temporary residence of Arthur Paiva, a Wackenhut supervisor, where Janet was raped and murdered. The conspirators deposited Janet's body forty miles from the crime scene. *Id.* 4-7.

After Janet's murder, Paiva conspired with other guards to conceal the crime by making false police reports, lying during police interviews, and intimidating witnesses. *Id.* at 13-15. James Nelson, another Wackenhut guard, purposely misled police by falsely reporting that he had spoken to Janet by phone and overheard the abduction. *Id.* at 17.

During the investigation, Wackenhut allegedly: (1) maintained the corporate motto, "I know nothing, see nothing, and speak only in kind words"; (2) created the expectation "that a scandal was not to be attached to the company name"; (3) actively promoted a code of silence; and (4) directed Paiva and Nelson to secrete themselves to avoid media attention. *Id.* at 16-17.

Janet's murder went unsolved for twenty-seven years, until 2006, when a former Wackenhut security guard confessed. Six people were convicted of either first- or second-degree murder, five of whom were Wackenhut employees.

On June 2, 2008, James Chandler was appointed personal representative of Janet's estate. On December 17, 2008, James sued Wackenhut for negligent hiring and negligent supervision. James alleged that Wackenhut and its agents fraudulently concealed the action. In the alternative, James alleged that Wackenhut should be equitably estopped from asserting a statute-of-limitations defense. The district court dismissed the action as untimely because Michigan's fraudulent concealment statute does not permit third party acts to extend the limitations period against a defendant. *Chandler v. Wackenhut Corp.*, No. 08-cv-1197, 2010 WL 307908, at * 5-7 (W.D. Mich. Jan. 19, 2010). The district court found that Wackenhut's own acts constituted "mere silence," which does not constitute fraudulent concealment. *Id.* at 7. The district court held that Michigan's doctrine of equitable estoppel was eliminated by *Trentadue v. Buckler Lawn Sprinkler*, 739 N.W.2d 664, 680 (Mich. 2007), and declined to impute Paiva's actions to Wackenhut because Paiva was acting outside the scope of his authority. *Chandler*, 2010 WL 307908 at *8-12. James filed this timely appeal.

**II.**

**A.     Michigan's Fraudulent Concealment Statute**

James's claims are untimely because he filed them outside of the applicable Michigan limitations period. In Michigan, a plaintiff must file an action "to recover damages for the death of

a person" within three years of the claim's accrual. Mich Comp. Laws § 600.5805(10). The claim

accrued on the date of Janet's murder, January 31, 1979. *See id.* at § 600.5827. However, when the

decedent has died before the original limitations period has run, the decedent's "personal

representative" may commence the action no later than "3 years after the period of limitations has

run." *Id.* at § 600.5852. As Janet's personal representative, James could have filed the action no

later than January 31, 1985.

The limitations period was not tolled because Wackenhut's alleged silence did not trigger

Michigan's fraudulent concealment statute, Mich. Comp. Laws § 600.5855. Section 600.5855 tolls

the limitations period if "a person who is or may be liable for any claim fraudulently conceals the

existence of the claim or the identity of any person who is liable." *Id.* These protections are

triggered by affirmative acts or misrepresentations; "mere silence on the part of the defendant is not

enough."[1] *Draws v. Levin*, 52 N.W.2d 180, 183 (Mich. 1952) (quoting *Dowse v. Gaynor*, 118 N.W.

615, 617 (Mich. 1908)). James claims that Wackenhut fraudulently concealed the action by: (1)

maintaining a motto of "I know nothing, see nothing, and speak only kind words"; (2) telling

employees that "a scandal was not to be attached to the company name"; (3) actively promoting a

code of silence; (4) and directing two perpetrators to secrete themselves to avoid media scrutiny.

---

[1] Wackenhut argues there are three elements to establish fraudulent concealment, relying on *Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 850 (6th Cir. 2006). Although *Evans* evaluated fraudulent concealment under Michigan law, the court incorrectly referred to the elements from *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975), a case that involved tolling under the Clayton act. However, contrary to James's contention, this error is of no consequence because both the federal standard and the Michigan require proof of wrongful concealment by a defendant, and not a third party.

Appellant Br. 16-18. James describes Wackenhut's motto and desire to avoid scandal as an "*omertà*" or a "code of silence." Appellant Br. at 17. However, Michigan courts have indicated that such a code of silence does not constitute fraudulent concealment. *See Doe v. Roman Catholic Archbishop of the Archdiocese of Detroit*, 692 N.W.2d 398, 406-7 (Mich. Ct. App. 2004). Further, requiring the two security guards to secrete themselves in a hotel room was tantamount to maintaining the company's silence. Although it is suspicious that Wackenhut directed the two primary perpetrators to remain silent, there is no allegation that the company engaged in coercion or any other like acts.[2] Instead, Wackenhut's actions were the manifestation of the code of silence.

Paiva's and Nelson's conduct did not trigger the fraudulent concealment statute against Wackenhut. "The provisions of [the fraudulent concealment] section cannot be extended . . . to concealments made by persons other than those sought to be charged in the action." *Stevenson v. Robinson*, 39 Mich. 160, 160 (Mich. 1878). Because the fraudulent concealment statute is designed to punish fraud, the statute's purpose would not be served by punishing a defendant for the wrongful acts of a third party. *Stoneman v. Collier*, 288 N.W.2d 405, 407 (Mich. Ct. App. 1979). Here, Paiva and Nelson were acting outside the scope of their employment when they concealed the crime; therefore, they were third parties. In light of this *Stevenson* rule, the limitations period for an action against Wackenhut is not tolled by the fraudulent actions of Paiva and Nelson.

---

[2] There could be an entirely innocent explanation: Wackenhut may have simply wanted to keep its name out of a media frenzy surrounding the murder. However, the company's motive is not relevant to the present analysis.

Contrary to James's contentions, subsequent amendments to the fraudulent concealment statute have not abrogated the *Stevenson* rule. The statute was first amended to address *International Union United Automotive Workers of America v. Wood*, 59 N.W.2d 60, 62-63 (Mich. 1953). In *Wood*, the Michigan Supreme Court held that the concealment of a defendant's identity, as opposed to concealing a "cause of action," did not trigger the fraudulent concealment statute. In 1954, the Michigan legislature responded by amending the statute:

> If any person, who is liable to any of the actions mentioned in this chapter, shall fraudulently conceal the cause of such action, **[or conceal the identity of any party thereto,]** from the knowledge of the person entitled thereto, the action may be commenced at any time within 2 years after the person who is entitled to bring the same shall discover that he had such cause of action, although such action would be otherwise barred by the provisions of this chapter.

*Vega v. Briggs Mfg. Co.*, 67 N.W.2d 81, 84 (Mich. 1954) (quoting P.A. 1954, No., 49) (amended language bracketed and bolded). This amendment squarely addressed the holding in *Wood* and did not, as James contends, address the *Stevenson* rule. As a later court found, "[t]here is no showing that the [1954] amendment in any way changed the previously established rule that concealment by one other than the one sought to be charged is not within the prohibition of the statute." *Stoneman*, 288 N.W.2d at 407.[3]

---

[3] James argues that the precise issue " was *almost* reached" by the Michigan Supreme Court in *Vega*, 67 N.W.2d at 84. Appellant Br. 33. However, the *Vega* court did not consider, or even mention, whether the concealment by one party tolled the statute of limitations against another. *See Vega*, 67 N.W.2d at 84. Instead, the court found that the 1954 amendment was not applicable because the cause of action accrued before the amendment. *Id.*

The statute was again amended in 1961 to address deficient drafting identified by the Michigan Supreme Court in *Ross v. Fisher*, 90 N.W.2d 483, 484-485 (Mich. 1958). In *Ross*, the court noted that the 1954 amendment created a disconnect between the statute's purpose and its "pay-off" clause. *Id.* Although concealment of a party's identity now was mentioned in the statute, the amendment failed to toll the limitations period pending the discovery of the identity of the liable party. *Id.* To remedy this inconsistency, the legislature amended the statute in 1961 to its current form:

> If **[a]** person who is **[or may be]** liable **[for any claim]** fraudulently conceal**[s the existence of the claim]** or the identity of any **[person who is liable for the claim]** from the knowledge of the person entitled **[to sue on the claim]**, the action may be commenced at any time within 2 years after the person who is entitled to bring the **[action]** discover**[s, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim]**, although the action would otherwise be barred by the period of limitations.

Mich. Comp. Laws § 600.5855 (amended language bracketed and bolded). These amendments fix the "pay-off" clause and make various other semantic clarifications. James argues that the substitution of the word "claim" for the word "action" in the first lines of the statute abrogates *Stevenson*. Appellant Br. 37-38. Although the words have different meanings,[4] it is a stretch to infer that this substitution reflects a legislative intent to discard the *Stevenson* rule. James points to nothing in the legislative history or subsequent Michigan decisions to support his argument. More

---

[4] A "claim" is "a statement of the facts . . . on which the pleader relies in stating the cause of action . . . ." Mich. Ct. R. 2.111(B)(1). An "action" refers to the lawsuit, brought to remedy such claims. *Id.* at 2.101.

likely, the legislature wanted to clarify that concealment of a single claim, rather than of an entire

cause of action, was sufficient to trigger the statute.

Subsequent Michigan opinions have continued to apply the *Stevenson* rule notwithstanding

the amendments. *See, e.g.*, *Stoneman*, 288 N.W.2d at 406; *Smith v. Sinai Hosp. of Detroit*, 394

N.W.2d 82, 87-88 (Mich. Ct. App. 1986). In *Stoneman*, the Michigan Court of Appeals declined to

toll the limitations period against General Motors where a lawyer for an unaffiliated car insurance

company fraudulently concealed GM's liability. 288 N.W.2d at 406. The court reaffirmed the

*Stevenson* rule, reasoning that it would be inequitable to punish GM for the wrongful acts of a third

party's lawyer.[5] *Id.* at 407.

The *Stoneman* court did not overturn *Stevenson*, as James argues. In *Stoneman*, the court

stated, "[i]t would be inequitable in the present case to punish General Motors for acts of

concealment engaged in by a third party." *Stoneman*, 288 N.W.2d at 407. James focuses on the term

"inequitable," and argues that its use means that the *Stoneman* court conducted an ad hoc balancing

rather than implementing a per se rule. However, when read in context, the quoted statement is

merely a reiteration of the purpose underlying the *Stevenson* rule and not a new test. Further, even

if the Michigan Court of Appeals intended to set forth a new test, this court sitting in diversity must

follow the precedent of the Michigan Supreme Court.

---

[5] James argues that *Stoneman* was wrongly decided because the court improperly focused on the wrong amendment and ignored *Ross*. However, as discussed above, neither the 1954 nor the 1961 amendment abrogated the *Stevenson* rule. The *Stoneman* court did not discuss *Ross* for good reason: the case has nothing to do with the *Stevenson* rule but instead discusses the inartful drafting of the 1954 amendment.

The Michigan Court of Appeals again applied the *Stevenson* rule in *Smith v. Sinai Hospital*, 394 N.W.2d at 88. In *Smith*, a woman was injured by the malpractice of defendants during her labor and delivery. *Id.* at 84-85. The woman argued that the statute of limitations should be tolled because the hospital had fraudulently concealed the identity of an anesthesiologist who had countermanded a doctor's orders, causing the injury. *Id.* at 88. The court rejected this, stating that "this position is contrary to law, which clearly states that a defendant cannot be penalized for the fraudulent acts of third parties in concealing the defendant's identity where the defendant played no part." *Id.* (citing *Stoneman*, 288 N.W.2d at 405).

**B.    Common Law Discovery Rule**

James cannot rely on the common law discovery rule because it no longer exists in Michigan. *See Trentadue v. Gorton*, 738 N.W.2d 664 (Mich. 2007). The *Trentadue* court, faced with a civil claim arising from a cold-case rape-murder similar to that perpetrated against Janet Chandler, held that Michigan's limitations provisions abrogated the common law discovery rule. *Id.* at 671-672. Although the provisions do not explicitly address the common law discovery rule, the *Trentadue* court held that Michigan legislature intended to occupy the field by enacting the comprehensive limitations provisions. *Id.* at 671. These provisions tolled the limitations period in certain circumstances, such as fraudulent concealment, but did not adopt a general discovery rule similar to the common law rule. Therefore, the court reasoned, "an extrastatutory discovery rule" would contravene legislative intent. *Id.* at 672.

The Michigan Supreme Court appears unlikely to overturn this rule. James concedes that *Trentadue* abolished the common law discovery rule, but argued in his brief to us that the Michigan Supreme Court was poised to overturn *Trentadue* in *Colaianni v. Stuart Frankel Development Corp., Inc.*, 791 N.W.2d 720 (Mich. 2010). In *Colaianni*, the Michigan Supreme Court granted leave to appeal to "address whether [*Trentadue*] was correctly decided." *Colaianni v. Stuart Frankel Dev. Corp., Inc.*, 777 N.W.2d 410, 410 (Mich. 2010). However, on December 29, 2010, the court dismissed *Colaianni* pursuant to a signed stipulation by the parties. *Colaianni*, 791 N.W.2d at 720. Although the Michigan Supreme Court might have been revisited the *Trentadue* rule, there is no indication that the court intended to change course. There are no other reasons for us not to apply the *Trentadue* holding.

**C.     Equitable Estoppel**

Michigan has also eliminated equitable estoppel in the fraudulent concealment context. The *Trentadue* court declined to equitably toll the limitations period because:

> if courts are free to cast aside a plain statute in the name of equity . . . then immeasurable damage will be caused to the separation of powers mandated by our Constitution. Statutes lose their meaning if an aggrieved party need only convince a willing judge to rewrite the statute under the name of equity.

*Trentadue*, 738 N.W.2d at 680 (internal quotations and citations omitted). The court held that equitable tolling is only available if "no controlling statute negated the application of equity . . . ." *Id.* In doing so, the *Trentadue* court "rejected the argument that equitable estoppel should have tolled the running of the statute of limitations." *Bearup v. Gen. Motors Corp.*, Nos. 272654, 272666,

- 10 -

2009 WL 249456, at *6 (Mich Ct. App. Feb. 3, 2009).[5] Here, as in *Trentadue*, James cannot rely on equitable estoppel because the fraudulent concealment statute controls and negates the application of equity.

Michigan courts have applied equitable estoppel as a way past the statute-of-limitations defense, but not in cases involving fraudulent concealment. Instead, the courts have applied the doctrine in the statute-of-limitations context only to cases involving a defendant who led the plaintiff to believe that the limitations period would not be enforced.[6] For example, in *Aastad v. Edwards*, No. 293101, 2010 WL 4679699, at * 2 (Mich. Ct. App. Nov. 18, 2010), the court weighed the estoppel factors and ultimately found that a plaintiff did not justifiably rely on the belief that the limitations period would not be enforced. *See also Siuda v. Tobin*, No. 285618, 2009 WL 3110817, at *2 (Mich. Ct. App. Sept. 29, 2009). This is consistent with *Trentadue* because, in contrast to the fraudulent concealment context, in these cases there was "no controlling statute [that] negated the application of equity . . . ." *Trentadue*, 738 N.W.2d at 680.

---

[5] James argues that *Bearup* in fact balanced the equities, which James contends indicates the test is an ad hoc balancing rather than a per se rule. *Id.* at *6. However, the *Bearup* court explicitly recognized equitable estoppel was no longer valid in the fraudulent concealment context, and was comparing the equities in *Bearup* to those in *Trentadue* to buttress this conclusion.

[6] The one exception to this appears to have arisen in the insurance context. In *Albrecht v. State Farm Mutual Automobile Insurance Co.*, No. 289042, 2010 WL 2505894, at *3 (Mich. Ct. App. June 22, 2010), the court held that an insurance company might be equitably estopped from asserting a statute-of-limitations defense because of the negligence of its insurance agent. The insurance agent sent the plaintiff the wrong form, which the plaintiff only discovered after the limitations period had expired. With little analysis, and no reference to *Trentadue*, the court remanded for further factual development to determine whether the insurance agent's acts were negligent such as to justify estoppel.

James attempts to distinguish equitable tolling from equitable estoppel, but in the statute-of-limitations context this argument is unpersuasive. According to James, equitable estoppel bars a defendant from profiting from his own misconduct whereas equitable tolling merely delays application of the statute. As James notes, "[t]olling operates on the statute of limitations; equitable estoppel operates on the party." Appellant Br. 49 (quoting *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001)). However, in the statute-of-limitations context, the practical effect is that application of equitable estoppel, just like tolling, would cause "courts . . . to cast aside a plain statute in the name of equity." *Trentadue*, 738 N.W.2d at 680. If faced with equitable estoppel, the *Trentadue* court would most likely find the fraudulent concealment statute bars equitable estoppel.

Finally, even if equitable estoppel existed in the statute-of-limitations context, James has not alleged circumstances sufficient to justify estopping Wackenhut. As discussed above, James alleges at most that Wackenhut was silent about the circumstances of Janet's murder, but "[s]ilence or inaction alone is insufficient to invoke estoppel absent a legal or equitable duty to disclose." *Tenneco Inc. v Amerisure Mut. Ins. Co.*, 281 Mich. App. 429, 446 (Mich. Ct. App. 2008). James has not alleged Wackenhut had any such duty; therefore, estoppel would not be triggered.

Further, the actions of Paiva and Nelson would not trigger the equitable estoppel bar against Wackenhut. Neither Paiva's nor Nelson's appalling conduct could be said to be within "the course of employment"; therefore, their fraudulent acts cannot be imputed to the corporation. *MCA Fin. Corp. v. Grant Thornton LLP*, 687 N.W.2d 850, 857 (Mich. Ct. App. 2004). Accordingly, Paiva's and Nelson's acts cannot estop Wackenhut.

**III.**

While Michigan law arguably leads to an unfortunate result in this case, we are bound to follow Michigan law because federal jurisdiction is based on diversity of citizenship. The district court's order dismissing James's action is affirmed.

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part. In the 33 years since January 1979, much has transpired in our world to provide platforms for voices that were previously muzzled or muffled. The Berlin Wall, the Soviet Union, and despotic regimes in the Middle East have crumbled as citizens of the world successfully struggled to air their grievances and concerns. Computers that once occupied entire rooms are now out-performed by devices that we carry in our pockets or purses and that give ordinary individuals access to information that provides a more-level playing field in the electronic age.

Despite those advances, however, during those same 33 years, James Chandler, Sr., has been continually thwarted in his quest to seek redress for the unconscionable brutality visited upon his daughter, Janet. For more than a quarter of a century, the identity of the barbarians who inflicted the pain upon the Chandler family was kept secret through means of a perverted sense of honor and loyalty fostered by a company that is, ironically, in the business of making people feel safe and secure. More recently, Chandler's efforts have been subverted by the very courts to which he turned for assistance. In concluding that James Chandler is barred by the applicable statute of limitations from pursuing his claims against Wackenhut, I believe that the majority opinion in this case has adopted a far-too-narrow interpretation of the information before it. I concur in that opinion's holding that Chandler has not established a plausible entitlement to relief on his claim of negligent hiring. I respectfully dissent, however, from that portion of the majority's decision that would bar the plaintiff, on statute-of-limitations grounds, from proceeding further with his claim that Wackenhut is liable for the negligent supervision or retention of some of its employees.

In reaching its conclusions, the majority opinion notes that "[t]his diversity action arises from the horrific abduction, rape, and murder of Janet Chandler . . . ." The relatively sterile recitation of the facts of the crimes that follows that statement fails, however, to convey the brutality of the actions of Wackenhut employees that drove the company to conceal from the police and from the Chandlers the deeds of its agents. I do not believe that the more clinical recounting of the events leading to Janet Chandler's death is simply a matter of writing style. Instead, I believe that the majority opinion's downplaying of the gruesome details of the crimes helps justify its conclusion that the employer could not have had an overriding interest in suppressing information about its operations and employment decisions. In reality, however, in light of the alleged ingrained culture of silence at Wackenhut, the more egregious the nature of the actions undertaken by Wackenhut employees, the more likely that supervisors and employees alike would conceal information that would be damaging to the company.

Because James Chandler's appeal is presented in the posture of a challenge to the district court's grant of the defendant's motion to dismiss, our review must accept Chandler's factual allegations as true and construe his complaint in the light most favorable to him. *See, e.g.*, *Watson Carpet & Floor v. Mohawk Indus.*, 648 F.3d 452, 456 (6th Cir. 2011). Consequently, our legal analysis should be informed by the following factual allegations made in Chandler's amended complaint:

> In October 1978, union workers at the Chemtron Corporation chemical plant in Holland, Michigan went on strike. Chemtron executives contracted with [Wackenhut] to provide extra security to protect the plant's property and its non-union, non-striking workers.

About 70 out-of-town [Wackenhut] security guards took up temporary residence at the Blue Mill Inn motel in Holland, just a few miles from the plant. Twenty-one-year-old Laurie Swank was the motel manager. Swank's roommate, Janet Chandler, worked the overnight shift as a front desk clerk.

[Wackenhut] security force supervisor, Arthur Paiva stayed in a guest house at the Chemtron plant.

Before long, relationships formed between female staff members at the Blue Mill Inn and a group of hard-drinking, hard-partying security guards.

Some of [Wackenhut's] guards became intimate with the motel manager, other desk clerks, and housekeeping staff.

Many of these relationships were sexual and non-monogamous in nature.

[Wackenhut] security guard James Nelson, frequently groped Janet Chandler in public and made comments about sexual acts he wanted to perform with her.

The sexual escapades between the guards and the motel staff bred jealousy and anger, much of it directed at Janet Chandler. Those feelings were fueled by other female employees at the Blue Mill Inn.

As the labor strike at Chemtron wound down, several guards and motel employees hatched a scheme to teach Janet Chandler a lesson. The plan involved sexual and physical violence. Janet Chandler was going to be taken to a guest house where she would be beaten and sexually assaulted. It was understood that Janet Chandler was not going to be coming back from this location, and that she was going to be killed.

On January 30, 1979, Janet Chandler worked the overnight shift at the motel. Sometime after midnight, January 31, James Nelson and another of [Wackenhut's] security guards, Robert Lynch, went into the Blue Mill Inn office and told Janet they were taking her to a surprise party at [Wackenhut] guard supervisor Arthur Paiva's guest house.

When Janet Chandler stepped out from behind the front desk, [Wackenhut] security guards Nelson and Lynch grabbed her and pinned her arms behind her back. They clamped handcuffs on her wrists, then led her to a waiting car. From a balcony above the motel office, several of [Wackenhut's] security guards--including Anthony

Williams--and a group of female motel employees watched [Wackenhut] security guards Nelson and Lynch shove Janet Chandler into the back seat of the car.

A short time later, [Wackenhut] security guards Nelson and Lynch went back to the motel. Lynch called the police just after 2:00 a.m. and reported a robbery at the motel. When the police arrived, Lynch told them the night clerk was missing.

At the Chemtron guest house, [Wackenhut] security guard supervisor Arthur Paiva held Janet Chandler captive until Nelson and Lynch returned. Then the party got started.

During the next few hours, at least 15 to 20 people--including six female motel employees--gathered at [Wackenhut] security supervisor Paiva's guest house, and nearly all of them either participated in or witnessed the beating, rape, and eventual strangulation murder of Janet Chandler.

Laurie Swank (Janet's roommate and boss at the Blue Mill Inn) has admitted that she was present at the guest house during the incident, and that she verbally assaulted Janet Chandler as she was being beaten and raped. Laurie Swank admitted that she knew Janet Chandler was going to be killed and was present when Janet Chandler died.

Swank also said she saw [Wackenhut] security supervisor Paiva rape Janet Chandler.

While [Wackenhut] security supervisor Paiva was raping Janet Chandler-whose eyes and mouth had been covered with duct tape-the security boss shouted at her, "You're going to die, bitch. You're going to die."

When [Wackenhut] security supervisor Paiva finished, he encouraged other guards to take turns raping Janet Chandler.

[Wackenhut] security guard Freddie Parker also raped Janet Chandler.

[Wackenhut] security guard Parker took off his belt and wrapped it around Janet Chandler's neck. [Wackenhut] security guards Nelson, Lynch, and Parker used the belt to repeatedly choke Janet Chandler into unconsciousness while they beat and raped her.

[Wackenhut] security guard James Nelson raped Janet, with Janet Chandler on her stomach and her hands restrained behind her back, while Nelson enforced intercourse.

[Wackenhut] security guard James Nelson forced Janet Chandler to perform oral sex on him while he, Nelson, pulled on the belt which was around Janet Chandler's neck.

[Wackenhut] security guard Anthony Williams masturbated while he watched fellow guards rape Janet Chandler. Later, Williams was seen choking Janet Chandler with a belt while forcing her to perform oral sex on him.

Once everyone finished, [Wackenhut] security guard Lynch choked Janet Chandler to death.

After Janet Chandler died, there was mass panic through the guest house.

Many of the party guests pitched in to clean up the crime scene. [Wackenhut] security guards Anthony Williams and Robert Lynch wrapped Janet Chandler's body in a sheet and put her in a car. Lynch drove the car nearly 40 miles south and dumped Janet Chandler in a snowdrift beside Interstate 196 in Van Buren County, Michigan.

[Wackenhut] security guard supervisor Paiva and the other [Wackenhut] security guards told the female motel workers to keep quiet. If they ever talked about what happened, the guards threatened, they would get the same treatment Janet Chandler had gotten.

A snowplow driver found Janet Chandler's naked body the next day.

* * * * *

Arthur Paiva conspired with other [Wackenhut] guards to cover up the rape and murder of Janet Chandler, so as to "protect" themselves and to protect [Wackenhut] from criminal and civil liability.

Arthur Paiva concocted a scheme wherein Robert Lynch would falsely report to the police the abduction of Janet Chandler from her job at the Blue Mill Inn, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

- 18 -

Arthur Paiva and other [Wackenhut] "guards" consciously chose to use condoms when they raped Janet Chandler, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva and other [Wackenhut] "guards" consciously chose to wash Janet Chandler's corpse, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva and other [Wackenhut] "guards" consciously chose to remove Janet Chandler's corpse from the guest house he occupied as the lead [Wackenhut] "guard" supervisor and dump her dead body in a snowbank nearly 40 miles away, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva affirmatively lied to the police in an interview immediately following the discovery of Janet Chandler's dead body, denying any knowledge and lying to the police, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva forced Patty Ward, his ex-girlfriend and witness to the rape and murder of Janet Chandler, to provide a false alibi for him, threatening her with murder, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva, likewise caused Laurie Swank, a witness to the rape and murder of Janet Chandler, to affirmatively lie to the police in an effort to cover up the rape and murder, threatening her with death, an affirmative act designed to [ ] avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva forced Cheryl Ruiz, a maid at the Blue Mill Inn and witness to the rape and murder of Janet Chandler, to "keep quiet" and affirmatively lie to the police in 1979, threatening that she "would end up just like Janet Chandler," an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva made the conscious choice to have Ronald Wirick, a [Wackenhut] "guard" assigned to photography of the Chemtron strike activities, attend the January "party" for Janet Chandler.

Arthur Paiva made the conscious choice to have Ronald Wirick photograph the rape and murder of Janet Chandler and the persons present.

Ronald Wirick followed orders and took a 24 exposure roll of film, giving it to another [Wackenhut] "guard" with the intent of transferring the images to Arthur Paiva per his order.

Arthur Paiva made the conscious choice of having the rape and murder of Janet Chandler and its attendees documented to blackmail all present into silence, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Indeed, Arthur Paiva threatened Ronald Wirick to keep silent, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

Arthur Paiva actually attended the funeral of Janet Chandler, another affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

* * * * *

Glenn Johnson, a [Wackenhut] "guard" present at the rape and murder of Janet Chandler testified at the trial of Paiva, et al, that [Wackenhut] had a motto in 1979 of "I know nothing, see nothing, and speak only in kind words."

Glenn Johnson, a [Wackenhut] "guard" present at the rape and murder of Janet Chandler testified at the trial of Paiva, et al, that "they knew a scandal was not to be attached to the company name."

At the time of the rape and murder of Janet Chandler, [Wackenhut] actively promoted a culture of omertà, or code of silence, an affirmative act designed to avoid detection and conceal "any claim" and the identities of "any person who is liable for the claim."

[Wackenhut]'s guard, James Nelson, in addition to participating directly in the brutal rape and murder of Janet Chandler, actively promoted the coverup by reporting to authorities that he was speaking with Janet Chandler on the phone and overheard the "abduction," an attempt to corrupt the truth that he was actually in on the deviant

scheme, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

James Nelson, being the person on the phone with Janet Chandler when she was "abducted," was a "popular" person with the police and the media following the discovery of Janet Chandler's dead body.

According to testimony elicited at the murder trial on October 26, 2007, within two-days of the brutal rape and murder of Janet Chandler, [Wackenhut]'s "corporate office" directed Arthur Paiva to secrete himself and James Nelson in a Holiday Inn hotel to avoid media attention, an affirmative act designed to avoid detection and conceal "the claim" and the identities of "any person who is liable for the claim."

(Paragraph numbering and capitalization omitted.)

Given the passage of the many years since the murder of Janet Chandler, James Chandler's only hope of resurrecting a long-expired cause of action against Wackenhut is to allege and establish that the defendant "fraudulently conceal[ed] the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim . . . ." Mich. Comp. Laws § 600.5855. By doing so, the courts may then toll the statute of limitations and permit the litigation of James Chandler's civil liability claims against Wackenhut.

Under Michigan law, "[f]raudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action." *Doe v. Roman Catholic Archbishop of the Archdiocese of Detroit*, 692 N.W.2d 398, 405 (Mich. Ct. App. 2004). Mere silence, however, is not sufficient to constitute fraudulent concealment. *See id.* at 406. Thus, in *Doe*, a case involving suit against a Roman Catholic diocese for allegedly concealing the identity of a priest responsible for the sexual abuse of a parish altar boy, the Michigan Court of Appeals ruled that the diocese's representation of the priest as fit, its

reassignment of the priest to different parishes, and the concealment of the sexual abuse activities of the priest did not constitute the employment of artifice. "Rather, through these acts, [the diocese] avoided disclosing [the priest's] actions and the [diocese's] knowledge of them to the public at large." *Id.*

The majority opinion in this case recognizes that Chandler's amended complaint does allege that Wackenhut fraudulently concealed its involvement in the murder of Janet Chandler by "(1) maintaining a motto of 'I know nothing, see nothing, and speak only kind words'; (2) telling employees that 'a scandal was not to be attached to the company name'; (3) and directing two perpetrators to secrete themselves to avoid media scrutiny." By citation to *Doe*, however, the majority then analogizes the code of silence employed by Wackenhut to the transfer of duty stations and avoidance of disclosure found in the situation involving the sexually-abusive clergyman. Were the analysis to end at that point, I would be bound by Michigan case law to concur in the majority's resolution of this appeal because fostering a policy of "I know nothing, see nothing, and speak only in kind words" is effectively no different from the archbishop's avoidance of disclosure in *Doe*. Similarly, simply ensuring that no scandal is attached to Wackenhut's name is arguably tantamount to the archbishop's vouching for the fitness of the offending priest – an action that *Doe* also equated with "mere silence" that will not constitute fraudulent concealment. Even Wackenhut's direction that Paiva and Nelson hide out in another motel is not substantively different from the archbishop's decision in *Doe* to transfer the pedophile priest to another parish that would be unaware of his deviant proclivities.

I firmly believe, however, that other acts undertaken *by Paiva* do indeed involve more than the mere avoidance of disclosure to the public at-large and actually do constitute the "employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action." *Id.* (quoting *Tonegatto v. Budak*, 316 N.W.2d 262, 266 (Mich. Ct. App. 1982) (citations omitted)). Consequently, such acts may serve to toll the statute of limitations on James Chandler's filing of his civil suit against Wackenhut.

Specifically, Paiva, as a Wackenhut supervisor, was alleged to have devised the plan to report to police that Janet Chandler had been abducted from her post at the Blue Mill Inn while speaking on the phone with Nelson. He was also involved in removing Janet Chandler's corpse from his residence to a snowbank nearly 40 miles away. Additionally, rather than simply remaining silent in the face of police questioning, Paiva affirmatively lied to the police by claiming no knowledge of the events of the early morning crime spree. Moreover, he threatened other witnesses with death should they be tempted to divulge the truth behind the kidnaping, rape, and murder, and he had another individual photograph the criminal deeds and the persons present in order to blackmail those persons into silence.

Wackenhut, the district court, and the majority opinion discount the relevance of such misdeeds by Paiva, however, by contending that Paiva was clearly exceeding the scope of his authority in committing those acts. According to their arguments, because Paiva's depraved acts were not within the scope of the authority granted him by Wackenhut, those misdeeds cannot be

attributed to the company so as to toll any statute of limitations for bringing suit for the negligent hiring, supervision, or retention of its thuggish employees.

Without question, Michigan law clearly provides that "the fraudulent concealment act does not operate against persons who do not participate in the concealment." *Stoneman v. Collier*, 288 N.W.2d 405, 407 (Mich. Ct. App. 1979). As explained by the state court in *Stoneman*, "The fraudulent concealment act punishes concealment. It would be inequitable . . . to punish [a company] for acts of concealment engaged in by a third party." *Id.* Contrary to the majority, however, I am convinced that James Chandler has at least raised a plausible claim that Paiva was indeed acting within the authority bestowed upon him by Wackenhut and is not a third party for the purposes of this suit.

The Michigan Supreme Court has defined the term "within the scope of employment" to mean "engaged in the service of his master, or while about his master's business." *Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 244 (Mich. 2011) (citation and internal quotation marks omitted), *cert.denied*, ___ S.Ct. ___, 2012 WL 33323, 80 U.S.L.W. 3267 (U.S. Jan. 9, 2012) (No. 11-505). Consequently, "[i]ndependent action, intended solely to further the employee's individual interests, cannot be fairly characterized as falling within the scope of employment." *Id.* Nevertheless, even if an act is contrary to an employer's instructions, the employer will still be liable for the employee's acts "if the employee accomplished the act in furtherance, or the interest, of the employer's business." *Id.*

Paiva was the company's supervisor of a security force of individuals from around the country who had come to Holland, Michigan, to preserve the peace in what was obviously a potentially volatile labor dispute. As the supervisor, Paiva was charged with the responsibility of ensuring compliance with Wackenhut's written and unwritten policies, including the alleged policies of "I know nothing, see nothing, and speak only in kind words," and "a scandal was not to be attached to the company name." The fact is beyond peradventure that dissemination of information that out-of-town security guards living in a local motel kidnaped, raped, and murdered a young woman due to jealousy in the provision of sexual favors would besmirch Wackenhut's brand and permanently attach a scandal to the company's name. Although it is true that the actions to conceal the crimes committed against Janet Chandler were also, or even in large part, done to shield Paiva himself from criminal liability, it is equally plausible that the concealment was also intended to spare Wackenhut negative publicity that would result in its own collateral consequences. In light of the culture promoted by the company, therefore, Paiva's actions to hide the company's connection to the crimes were not outside the scope of his authority, but rather were in strict conformity with, and demanded by, it.

Moreover, the very nature of Wackenhut's operations lends credence to the allegation that Paiva was not acting outside the scope of his authority in performing and allowing the atrocities committed against Janet Chandler. The Wackenhut guards were brought into the Holland, Michigan, area from around the country in order to represent the interests of the company. In that area, Paiva himself was the very face of the company, indeed *was* Wackenhut, and, as supervisor of the guards,

was responsible for directing the guards' activities while engaged by Chemtron. As the representative of Wackenhut's policies and procedures in Holland at that time, Paiva's decisions regarding protection of the corporate image were the decisions of Wackenhut itself and could not, therefore, have been outside the scope of his authority to represent the company during the period of its hire by Chemtron.

Nevertheless, even finding that Paiva was arguably acting within the scope of his authority when he undertook to conceal the involvement of Wackenhut employees in the heinous activities of January 31, 1979, would not necessarily result in a reversal of the district court's grant of Wackenhut's motion to dismiss. As is now well-established, to survive a motion to dismiss, "the complaint's 'factual allegations must be enough to raise a right to relief above the speculative level,' and 'state a claim to relief that is plausible on its face.'" *Watson*, 648 F.3d at 457 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

In support of his claim that Wackenhut negligently hired certain employees, James Chandler alleges that at least one other security firm had, as early as 1976, utilized psychological and psychiatric fitness tests to ensure that its employees would not exhibit the violent tendencies that individual Wackenhut employees did in this case. The amended complaint does not, however, allege that any particular Wackenhut employee would have failed such a fitness test at the time of hiring. Without some indication that the defendant company should have been aware of the proclivities of its potential employees, James Chandler's negligent-hiring cause of action is purely speculative and

fails to state a claim that is plausible on its face.  I thus agree that the district court did not err in dismissing count one of the first amended complaint.

By contrast, the second count of the amended complaint, alleging negligent supervision or retention of employees, does satisfy the *Twombly* standard for withstanding a motion to dismiss.  In the complaint, James Chandler claims that the security guards living temporarily at the Blue Mill Inn were "hard-drinking" and "hard-partying."  He also asserts that many of the guards engaged in sexual, non-monogamous, jealousy-inducing relationships with female members of the motel staff, and that one guard, James Nelson, "frequently groped Janet Chandler in public and made comments about sexual acts he wanted to perform with her."  Accepting such allegations as true, as we must at this stage of the litigation, it is at least plausible that the Wackenhut supervisor, aware of such interactions and circumstances, should have taken appropriate actions to prevent violent sexual encounters between the guards and the motel employees.  For these reasons, I believe that count two of James Chandler's amended complaint was erroneously dismissed and that the negligent-supervision-or-retention count should be remanded to the district court for such further proceedings as are necessary.

I respectfully dissent from that portion of the majority opinion that would hold otherwise.

COLE, Circuit Judge, concurring. When a federal court hears a case due to the diversity of the litigants, it must apply substantive state, not federal, law. As a general matter, this principle furthers justice by ensuring litigants the same outcome regardless of which court hears their claims. At times, however, this principle ties us to law we believe to be erroneous. Sadly, this is one such case.

Today, our hands are tied by a rope woven from the pages of the Michigan Supreme Court's decision in *Trentadue*. To give James and Glenna Chandler their day in court, as they surely deserve, Michigan law requires us to find that Arthur Paiva's actions were within the scope of his employment with Wackenhut. For the reasons stated in the majority opinion, I am unable to do so. I regretfully concur.