*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL DRIVER and KATHERINE DRIVER,

UNPUBLISHED
December 28, 2023

Plaintiffs-Appellees,

v

No. 364438
Ingham Circuit Court
LC No. 21-000723-CZ

RYAN COREY,

Defendant,

and

DANA BORDEAUX,

Defendant-Appellant.

Before: BORRELLO, P.J., and SWARTZLE and PATEL, JJ.

PER CURIAM.

In this dispute involving the misappropriation of funds by defendants, Dana Bordeaux appeals[1] as of right the trial court's order granting summary disposition in favor of plaintiffs Michael Driver and Katherine Driver.[2] For the reasons set forth in this opinion, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

Defendant Ryan Corey is a residential construction contractor who has worked on projects throughout Michigan and "various other states," including projects for members of plaintiffs'

---

[1] According to the record evidence presented to this court, defendant Ryan Corey has never appeared in this action. A default judgment was entered against him in the trial court, and he is not a party to this appeal.

[2] Plaintiffs are married to each other. We will refer to plaintiffs individually by first name and collectively as "the Drivers."

extended family. Defendant Bordeaux began dating Corey at some point in approximately 2019. Plaintiffs Michael and Katherine Driver own residences in both Nevada and Illinois.

On approximately June 25, 2021, Corey entered into a written contract with Kathy Corbett, who is Michael's aunt, to renovate and remodel Corbett's kitchen in her Wilmette, Illinois residence for $54,211. Corbett testified that Corey and Bordeaux "represented themselves . . . as a company as both being involved" in the project, and they both came to Corbett's residence to take measurements and discuss plans for the project. Corbett believed that Bordeaux would be helping with the design and managing organizational and communication details for the project. During one meeting, Bordeaux spent "probably two hours" with Corbett discussing and making recommendations about color schemes, paint samples, and trim designs. Bordeaux also offered to help refinish Corbett's furniture and select fabrics for window treatments and recovering sofas to match the new room design. Corbett testified that she had paid $43,300 on the contract and that she made all of her payments directly to Bordeaux's checking account, as she had been instructed by Corey.

Additionally, in late July or August 2021, the Drivers met with Corey and Bordeaux at a home in Las Vegas that the Drivers had recently purchased and wished to renovate. Over the course of a two-day period, they discussed the scope of the renovation work that the Drivers wanted Corey to complete, which included demolition, cabinetry, countertops, flooring, and paint throughout the home. The Drivers had also hired an "outside designer" for the project, independent from Corey and Bordeaux. According to Michael, Corey indicated during one of their conversations before the meeting that there would be someone helping him with the project, but Michael was surprised that Bordeaux accompanied Corey to the initial meeting. Katherine testified that she "only understood [Bordeaux] to be [Corey's] girlfriend there with him at the time" and that "[w]e had no intention of her having a role on the project." Nonetheless, Katherine indicated that she and Michael covered the airfare for both Corey and Bordeaux to fly to Las Vegas for the meeting.

Michael testified that "there was a draft contract sent over [to the Drivers from Corey], but I don't think we ever got to the point of executing it." In a text message thread between Michael and Corey, they had discussed an estimated project budget of $260,000. Michael indicated that he did not "believe" that he had an agreement with Bordeaux to perform construction work on the property. However, Michael testified that Corey "held [Bordeaux] out to be part of his team" working with him "as a partner." Michael explained that he was told that Bordeaux had a "cleaning company," that she had "design ideas," and that she would be performing administrative work.

Over the course of the next 30 to 40 days after this initial meeting, the Drivers received invoices for work that Corey was purportedly completing on the Las Vegas home. This work included demolition, cabinetry design, and travel expenses. The Drivers paid over $12,000 to Bordeaux's Venmo account in four or five payments. Corey directed the Drivers to make the payments on the invoices to Bordeaux's Venmo account. According to Michael, approximately $8,000 of the amount they paid was attributable to demolition work that was completed by a subcontractor. Michael assumed that Corey would pay the subcontractor from the funds remitted to Corey through Bordeaux's Venmo account. However, the demolition subcontractor subsequently contacted Michael to inform him that he had not been paid. Michael subsequently paid the demolition subcontractor directly. Around that same time, Corbett contacted Michael and

informed him that Corey had not performed any work on her project even though she had already paid Corey and Bordeaux approximately $42,000. As a result, although Bordeaux and Corey had requested an additional payment from the Drivers of $15,000 or $16,000 "for some HVAC equipment," the Drivers refused to make any more payments.

Corbett testified that Corey and Bordeaux had come together to her home four or five times, but they had not performed any work on her home. She explained that these meetings essentially involved discussions about design changes, obtaining additional measurements, and "setting up." Bordeaux helped Corey measure by holding one end of the tape measure, and "she walked around and made comments about how the design could be affected this way or that." At some point, Bordeaux returned $400 to the Drivers as a "show of good faith."

Bordeaux testified in her deposition that she had "no role in any company" with respect to Corey's construction business, although she admitted that she performed unpaid painting work for one of Corey's other customers who is not involved in this lawsuit. Bordeaux indicated that she worked for a separate company where she "[c]lean[ed] dry wall dust" and that she was working for this company throughout 2021. When asked whether she worked on the Driver project, Bordeaux responded, "No. I got asked my opinion and I gave my opinion but other than that, no, I was not on a contract." She admitted that she went to Las Vegas and met the Drivers, but she claimed she was forced to go on the trip by Corey. Bordeaux indicated that she did not perform any services, did not clean up, and did not paint for that project, but she admitted that she "Googled pictures" that she shared with Michael for design ideas. Bordeaux testified that Corey used her phone to communicate with Corbett and the Drivers. She stated that if she ever called Corbett, it was because Corey had threatened her.

According to Bordeaux, she did not have a Venmo account until Corey told her to get one. The account was solely in Bordeaux's name. She testified that the money from the Driver project was paid into her Venmo account because Corey told her "that his bank accounts were tied up in a child support battle and that's how come the money couldn't go into his." Bordeaux further testified, "He had full range of my debit card and bank account because that was not my money. He told me that money was money he was going to get as a profit." Corey knew the PIN for Bordeaux's debit card, as well as her phone and e-mail passwords. However, Corey's name was not on Bordeaux's bank account.

Bordeaux acknowledged that she received money into her accounts from the Drivers and Corbett on Corey's behalf, but she maintained that it was not her choice. Bordeaux stated, "If I didn't do what he wanted, I got my butt kicked." Bordeaux explained that Corey told her that a $22,000 payment into her account from Corbett was for appliances and supplies, as well as part of Corey's profit for the job. Bordeaux subsequently obtained a $7,000 money order through her bank, pursuant to Corey's direction, to be used for purchasing appliances. Bordeaux indicated that Corey spent the rest of the money and that she permitted him to use her account to spend the money because "otherwise I got the shit kicked out of me." She also feared for her life. Bordeaux testified that Corey forced her to withdraw thousands of dollars for him to spend at casinos, and although she admitted that she also gambled, she claimed that she "didn't want to" and that she did not remember whether she used funds from the same account into which the Driver and Corbett project funds had been deposited. Bordeaux indicated that she used her own money to gamble. Corey also used Bordeaux's debit card purchase lottery tickets. Bordeaux maintained that Corey stole

the money and that she did not help him steal it. Bordeaux did not know of any money that was actually spent on the Corbett or Driver projects.

PROCEDURAL HISTORY

On November 15, 2021, the Drivers initiated this action against Corey and Bordeaux based on their actions in connection with the Driver and Corbett projects. Corbett had assigned her claim to the Drivers so they could file a single lawsuit.[3] In their complaint, the Drivers alleged that they had an oral contract with Corey for construction work on their home, that they paid Corey for construction work, and that he "failed to complete the construction work for which he was paid or to pay certain of the subcontractors and suppliers who provided labor and material" to the project. The Drivers alleged that Corey had misappropriated the funds without providing repayment. With respect to the claim assigned by Corbett, the Drivers alleged that Corey had entered into a written contract with Corbett to renovate her kitchen, that $43,400 had been paid toward the project into Bordeaux's bank account pursuant to Corey's direction, that Corey and Bordeaux used project funds for personal expenses, and that Corey and Bordeaux had not performed any work on Corbett's property.

Based on the above allegations, the Drivers raised two breach of contract claims against Corey, seeking damages of $11,960 on the contract with the Drivers and $43,400 on the contract with Corbett. The Drivers also asserted a claim against Bordeaux and Corey for violation of the Michigan builders' trust fund act (MBTFA), MCL 570.151 et seq., alleging that Bordeaux and Corey acted in concert to receive the funds from the two building projects and then misappropriated those funds by expending some or all of the funds for purposes other than to pay subcontractors, material suppliers, or laborers on the projects. On the MBTFA claim, the Drivers alleged that Bordeaux and Corey were jointly and severally liable for $55,360 in damages. Finally, the Drivers asserted a conversion claim against Bordeaux and Corey based on their misappropriation of the funds for the two projects. The Drivers alleged that they were entitled to treble damages totaling $166,080 and that Bordeaux and Corey were jointly and severally liable for this amount. Corey failed to appear, and a default judgment was entered against him.

Bordeaux subsequently moved for summary disposition under MCR 2.116(C)(8) and (C)(10). Bordeaux argued that the MBTFA did not apply to her because she was not a contractor or subcontractor, she did not hold herself out as a contractor or subcontractor, she was not a party to either of the contracts, and she was not an employee, agent, or partner of Corey's construction business. Bordeaux argued that she was a domestic violence survivor who complied with Corey's demands out of fear of bodily harm. Further, Bordeaux argued that the conversion claim against her could not survive because she never held the money in trust, since the MBTFA did not apply to her, and there accordingly was no claim that she received the funds without the consent of the Drivers and Corbett.

The Drivers also moved for summary disposition, pursuant to MCR 2.116(C)(9) and (C)(10). They argued that Bordeaux could be held liable for her actions of misappropriating funds in violation of the MBTFA because she acted as Corey's representative and she actually received

---

[3] Corbett is not a party to this action.

-4-

the construction project funds. The funds never belonged to Bordeaux, and the funds were required to be held in trust pursuant to the terms of the MBTFA. The Drivers further argued that Bordeaux wrongfully exerted dominion over the funds held in trust by spending the funds on gambling and other expenses unrelated to the construction projects for which they were intended, thereby converting the funds in violation of MCL 600.2919a. With respect to statutory conversion, the Drivers asserted that Bordeaux was liable for treble damages, costs, and attorney fees totaling $145,080 for the two projects. Finally, the Drivers argued that duress was not a recognized defense to a violation of the MBTFA or conversion and that sanctions were warranted for asserting a frivolous defense.

The trial court granted the Drivers' motion for summary disposition on both the MBTFA claim and the conversion claim, awarded treble damages under MCL 600.2919a, denied Bordeaux's motion for summary disposition, and denied the Drivers' motion for sanctions. This appeal followed.

## STANDARD OF REVIEW

This Court's review of a trial court's decision on a motion for summary disposition is de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). The trial court in this case cited both MCR 2.116(C)(9) and MCR 2.116(C)(10) in announcing its ruling. Summary disposition is proper under MCR 2.116(C)(9) if the "opposing party has failed to state a valid defense to the claim asserted against him or her." Summary disposition is proper under MCR 2.116(C)(10) if "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law."

A "motion for summary disposition under MCR 2.116(C)(9) is tested solely by reference to the parties' pleadings." *BC Tile & Marble Co, Inc v Multi Bldg Co, Inc*, 288 Mich App 576, 582; 794 NW2d 76 (2010) (quotation marks and citation omitted). It is evident, however, that the trial court in this case relied on the parties' documentary evidence submitted with their summary disposition motions. "Where the parties rely on documentary evidence, appellate courts proceed under the standards of review applicable to a motion made under MCR 2.116(C)(10)." *BC Tile*, 288 Mich App at 582 (quotation marks and citation omitted).

On a motion under MCR 2.116(C)(10), the evidence submitted by the parties must be considered in the light most favorable to the opposing party, and the motion "may only be granted when there is no genuine issue of material fact." *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## VIOLATION OF THE MBTFA

"The MBTFA imposes a trust on funds paid to contractors and subcontractors for products and services provided under construction contracts." *Livonia Bldg Materials Co v Harrison Constr Co*, 276 Mich App 514, 518; 742 NW2d 140 (2007). "Because the MBTFA is a remedial statute, designed to protect people of the state from fraud in the construction industry, it should be

construed liberally for the advancement of the remedy." *BC Tile*, 288 Mich App at 583. Although the MBTFA is "a penal statute that does not expressly provide a civil cause of action," a civil cause of action for violation of the MBTFA has been recognized by our Supreme Court for over 50 years.[4] *DiPonio Constr Co, Inc v Rosati Masonry Co, Inc*, 246 Mich App 43, 48; 631 NW2d 59 (2001), citing *B.F. Farnell Co v Monahan*, 377 Mich 552, 555, 557; 141 NW2d 58 (1966).

The MBTFA is comprised of the following three statutes:

> In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes. [MCL 570.151.]

> Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part therefor, of any payment made to him, for any other purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement, shall be guilty of a felony in appropriating such funds to his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded, and, upon conviction, shall be punished by a fine of not less than 100 dollars or more than 5,000 dollars and/or not less than 6 months nor more than 3 years imprisonment in a state prison at the discretion of the court. [MCL 570.152.]

> The appropriation by a contractor, or any subcontractor, of any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment, shall be evidence of intent to defraud. [MCL 570.153.]

A claim under the MBTFA requires a plaintiff to show:

> (1) that the defendant is a contractor or subcontractor engaged in the building construction industry, (2) that the defendant was paid for labor or materials provided on a construction project, (3) that the defendant retained or used those funds, or any part of those funds, (4) that the funds were retained for any purpose other than to first pay laborers, subcontractors, and materialmen, and (5) that the laborers, subcontractors and materialmen were engaged by the defendant to perform labor or furnish material for the specific construction project. [*Livonia Bldg Materials*, 276 Mich App at 519.]

---

[4] This civil cause of action has been limited to private construction contracts. *DiPonio*, 246 Mich App at 48 n 4, citing *In re Certified Question*, 411 Mich 727, 732; 311 NW2d 731 (1981).

In this case, it is undisputed that the Drivers and Corbett paid thousands of dollars into accounts that were in Bordeaux's name and that these funds were intended to pay for renovations that Corey was supposed to complete on the respective homes. It is also undisputed that Corey did not complete the intended renovations and that money that had been paid into Bordeaux's accounts for the Driver and Corbett projects was instead spent at casinos and on lottery tickets. Michael testified that a subcontractor who had performed demolition work on the Drivers' residence was not paid by Corey and that Michael paid that subcontractor. Bordeaux testified that she did not know of any money that was actually spent on the Driver or Corbett projects.

This Court has explained that the "builders' trust fund act was originally passed in 1931 as a depression-era measure to afford additional protection to subcontractors and materialmen" by preventing contractors from "juggling funds between unrelated projects," which was a practice that had left many subcontractors unpaid in situations where contractors had become insolvent. *DiPonio*, 246 Mich App at 49 (quotation marks and citations omitted).

However, the current statute is not so narrowly limited. Under MCL 570.151, the money paid for the construction project "shall be considered by this act to be a trust fund, *for the benefit of the person making the payment*, contractors, laborers, subcontractors or materialmen . . . ." (Emphasis added.) Thus, "[t]o effectuate its purpose of protecting people from fraud and imposition in the building construction industry, the act creates a trust for the benefit of laborers, subcontractors or materialmen, as well as for the person who pays for the construction project." *Blair v Trafco Prod, Inc*, 142 Mich App 349, 353; 369 NW2d 900 (1985); accord *People v Brown*, 239 Mich App 735, 740-741; 610 NW2d 234 (2000) ("[B]ecause the MBTFA is a remedial statute, designed to protect people of the state from fraud in the construction industry, it should be construe[d] . . . liberally for the advancement of the remedy.") (quotation marks and citation omitted; ellipsis and second alteration in original).

Furthermore, the "statutory language [in the MBTFA] also indicates that the trust is imposed as to anticipated future costs of a particular project." *People v Miller*, 78 Mich App 336, 342; 259 NW2d 877 (1977). In *Miller*, the defendant challenged his conviction for violating the MBTFA. *Id*. at 339. The defendant had deposited the customer's initial payment into his overdrawn checking account and then used the funds the next day, before performing any work on the customer's project. *Id*. On appeal, the defendant argued that he did not technically violate the MBTFA because there were no subcontractors or suppliers who were unpaid and that he should have been granted a directed verdict. *Id*. at 340-341. This Court affirmed the trial court's denial of a directed verdict. *Id*. at 344. Acknowledging the defendant's argument that "technically no one was 'unpaid' at the time the . . . downpayment was used," this Court observed that this was "because no one was under contract to do any work on the [customer's] pool." *Id*. at 343. This Court concluded as follows:

> In light of the statutory purpose and the statutory language referring to future obligations of the contractor, we hold that a trust is imposed as to funds which will be needed to pay laborers, subcontractors or materialmen who will have to be hired to complete the particular construction project. In this sense the laborers or materialmen necessary to complete the [customer's] pool were "unpaid." To rule any other way would allow only the most unscrupulous offenders to escape the statutory prohibition allowing those who have done no work or ordered no materials

whatever to claim the statute was not violated since no one was "unpaid." [*Id.* at 343-344.]

In this case, as in *Miller*, funds that the Drivers and Corbett had remitted to Corey through Bordeaux's accounts were used for purposes completely unrelated to the building projects before work on the projects was completed and without first paying a demolition subcontractor for work performed on the Drivers' residence. Although Bordeaux disputes whether she can be personally liable in this action, there is clearly no question of material fact that the other elements of a claim under the MBTFA have been satisfied. *Id.*; *Livonia Bldg Materials*, 276 Mich App at 519. "[I]n order to state a civil cause of action under the builders' trust fund act, a plaintiff need only show that the contractor received payment for building construction purposes and that the contractor retained or used those funds 'for any other purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement . . . .' " *DiPonio*, 246 Mich App at 52, quoting MCL 570.152. Appropriation by the contractor of money received before using those funds for the project and " 'payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment' " is evidence of intent to defraud. *Livonia Bldg Materials*, 276 Mich App at 520, quoting MCL 570.153.

As previously indicated, Bordeaux argues that the MBTFA is inapplicable to her because she was not a contractor or subcontractor. She claims that she did not have any "actual" role in Corey's construction business or the construction work that Corey had agreed to perform for the Drivers and Corbett.

Nonetheless, we conclude that Bordeaux was a subcontractor within the meaning of the MBTFA because she admitted that she received the funds into her accounts. This Court has held that a person who collects payments on a building contract, even if that person acts in an individual capacity, has "received the funds as a 'subcontractor' within the meaning of the building contract fund act and is considered to be trustee of such funds." *Reiter v Kuhlman*, 59 Mich App 54, 61; 228 NW2d 830 (1975).[5] In *Reiter*, the plaintiff performed work as a subcontractor for another subcontractor who died shortly after the plaintiff completed the work. *Id.* at 55-56. The decedent subcontractor's son collected the money on the construction contract, and the plaintiff alleged that the funds were fraudulently withheld in violation of MCL 570.151. *Id.* The decedent's son argued that MCL 570.151 was inapplicable because he was acting as the administrator of his father's estate and collected the funds on behalf of the estate. *Id.* at 56, 61. This Court concluded:

When defendant, whether as administrator of Milton J. Kuhlman's estate or in his individual capacity, collected the sum of $11,300 in payment for completing the contract, he thereby received this amount as a 'subcontractor' within the meaning of the building contract fund act. Funds for building construction purposes,

_____

[5] This Court has stated that "[a]ll of our published decisions have precedential effect under the rule of stare decisis" and that published opinions from before November 1, 1990 "should be followed by this Court unless 'important prudential considerations' compel us to do otherwise." *In re Guardianship of Bazakis*, 342 Mich App 144, 153 n 4; 992 NW2d 673 (2022) (citation omitted). Thus, it is proper for this Court to follow *Reiter*.

received by a subcontractor as a trustee under [MCL 570.151 *et seq*.] do not become part of his estate when he dies nor do they become a part of his estate because such funds are paid to the administrator of his estate. [*Id*. at 59.]

Here, the funds were undisputedly intended as payment for the construction projects at issue, and Bordeaux became a trustee of those funds for purposes of the MBTFA by collecting them into accounts in her name. *Id*.

This conclusion is consistent with this Court's decision in *Brown*, in which this Court affirmed the conviction of a corporate officer under the MBTFA based on the officer's personal participation in the violation of the statute. *Brown*, 239 Mich App at 737, 739-740. In that case, this Court reasoned that because "[i]t is beyond question that a corporate employee or official is personally liable for all tortious or criminal acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation," a corporate officer could be held criminally or civilly liable under the MBTFA.[6] *Brown*, 239 Mich App at 739-741 (quotation marks and citation omitted); accord *Livonia Bldg Materials*, 276 Mich App at 519 (applying the *Brown* rule in the civil context and stating: "Officers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully. [A] corporate employee or official is personally liable for all tortious or criminal acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation.") (citations and quotation marks omitted; alteration in original).

To the extent Bordeaux appears to argue that the lack of a corporate entity in this case is somehow helpful to her cause, she is mistaken. This Court has held that a sole proprietor acting as a contractor may be liable under the MBTFA. *People v Whipple*, 202 Mich App 428, 429, 432, 435-436; 509 NW2d 837 (1993). Moreover, as previously discussed, receiving the project funds on behalf of the contractor under these circumstances is sufficient to bring Bordeaux within the scope of the MBTFA. *Reiter*, 59 Mich App at 59. Ultimately, "[i]f a defendant personally misappropriates funds after they are received by the corporation, he or she can be held personally responsible under the MBTFA." *Livonia Bldg Materials*, 276 Mich App at 519.

Accordingly, the trial court did not err in granting summary disposition against Bordeaux for violating the MBTFA.

---

[6] Although *Brown* was a criminal proceeding, the *Brown* Court cited with approval federal authority holding that a corporate officer could be held civilly liable under the MBTFA to further support its conclusion regarding criminal liability. *Brown*, 239 Mich App at 741, citing *Au Bon Pain Corp v Artect, Inc*, 653 F2d 61, 65 (CA 2, 1981) (applying Michigan law). Furthermore, it is well established that violation of the MBTFA may lead to both criminal and civil liability. *DiPonio*, 246 Mich App at 48. Finally, this Court has expressly incorporated the holding from *Brown* into the civil context for claims under the MBTFA. *Livonia*, 276 Mich App at 519 ("If a defendant personally misappropriates funds after they are received by the corporation, he or she can be held personally responsible under the MBTFA.") (citing *Brown*, 239 Mich App at 743-744).

STATUTORY CONVERSION

Turning to the conversion claim, MCL 600.2919a provides as follows:

（1）A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

（a）Another person's stealing or embezzling property or converting property to the other person's own use.

（b）Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

（2）The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

"[T]he scope of a common-law conversion is now well-settled in Michigan law as any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distribution Servs., Inc*, 497 Mich 337, 351-352; 871 NW2d 136 (2015) (quotation marks and citation omitted). Through MCL 600.2919a(1)(a), however, the Legislature "created a remedy against a person who 'steal[s] or embezzl[es] property or convert[s] property to the other person's own use.' " *Id*. at 354 (alterations in original). "[T]he Legislature's inclusion of the phrase 'to the other person's own use' in § 2919a(1)(a) indicates its intent to limit § 2919a(1)(a) to a subset of common-law conversions in which the common-law conversion was to the other person's 'own use.' " *Id*. at 355. Additionally, "MCL 600.2919a applies to all 'stealing' and 'embezzling.' " *Id*. at 347 n 19.

Here, Bordeaux argues on appeal that the trial court erred by granting summary disposition against her on the statutory conversion claim[7] because the Drivers and Corbett knowingly and voluntarily conveyed the funds to Bordeaux and Corey, thereby establishing that Bordeaux did not receive the funds without the payees' consent. This Court has stated that to "support an action for conversion of money, the defendant must have obtained the money without the owner's consent to the creation of a debtor-creditor relationship and must have had an obligation to return the specific money entrusted to his care." *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 591; 683 NW2d 233 (2004) (quotation marks and citation omitted).

Nonetheless, "[m]oney in any form is generally regarded and treated as property, and it is well settled that an action will lie for the conversion thereof, where there is an obligation to keep intact or deliver the specific money in question, and where such money can be identified." *Garras*

---

[7] Based on the language of the complaint and the trial court's summary disposition ruling, it does not appear that plaintiffs raised a common-law conversion claim.

-10-

*v Bekiares*, 315 Mich 141, 148-149; 23 NW2d 239 (1946) (quotation marks and citation omitted). Under the MBTFA, the money was held in trust for benefit of the Drivers and Corbett respectively. MCL 570.151; *Blair*, 142 Mich App at 353. "The primary duty of the trustee is to ensure that trust funds are spent on the particular project for which the trust funds were deposited. As trustee, the contractor owes a fiduciary duty to the beneficiaries to exercise proper and honest judgment, considering the nature and object of the trust." *Weathervane Window, Inc v White Lake Constr Co*, 192 Mich App 316, 325-326; 480 NW2d 337 (1991). "Once defendants' original duty to hold plaintiffs' funds in trust arose, defendants had an *independent* fiduciary duty not to convert the trust funds they held." *Dep't of Agriculture v Appletree Mktg, LLC*, 485 Mich 1, 12; 779 NW2d 237 (2010). "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Id*. at 14.

Here, because Bordeaux held the funds paid by Corbett and the Drivers in trust to be used for their respective construction projects, the trial court did not err by determining that she could be liable under MCL 600.2919a for misappropriating those funds and permitting the funds to be used for purposes other than the respective construction projects. *Id*. at 12, 14; *Weathervane Window*, 192 Mich App at 325-326. In this context, the proper focus is on "defendant['s] actions after possession of the property was lawfully gained," rather than on "how defendant[] came into possession of the property," and the law provides a remedy for the trust beneficiary and rightful owner in the event the trustee misuses the property. See *Appletree Mktg*, 485 Mich at 16.

To the extent that Bordeaux has seemed to imply throughout this case that her conduct was the product of pressure exerted on her by Corey through violence and threats, her assertions appear to suggest the defense of duress. "Duress requires compulsion or coercion by which one is illegally forced to act by fear of serious injury to person, reputation or fortune." *Apfelblat v Nat'l Bank Wyandotte-Taylor*, 158 Mich App 258, 263; 404 NW2d 725 (1987). However, Bordeaux has not developed any appellate argument relying on duress in her brief and has not cited any legal authority to support a conclusion that she is entitled to any relief on appeal based on the concept of duress. She therefore has abandoned this argument.[8] "It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for

---

[8] The record is unclear regarding the precise nature and extent of Bordeaux's involvement in the two construction projects. There was testimony that Corey and Bordeaux presented Bordeaux as a member of the team involved in the project to Corbett and the Drivers. It was also undisputed that Corbett and the Drivers made payments for the projects to accounts that were in Bordeaux's name. However, Bordeaux testified that Corey forced her, through threats of physical violence, to accept the money into her accounts and to permit him to spend the money as he desired. Bordeaux claimed that Corey stole money and that she did not help him. Accordingly, there appear to be genuinely disputed questions of fact on these matters. Nonetheless, and without minimizing allegations of domestic violence, these factual disputes are not material to resolving the matter currently before this Court because Bordeaux has not developed any cogent argument, supported by legal authority, that would demonstrate she is entitled to relief on appeal.

authority either to sustain or reject his position." *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted).

To the extent Bordeaux seemingly claims that she relied on Corey's direction and that she was merely a bystander working on Corey's behalf, "with regard to the tort of conversion in particular, a defendant who wrongfully exerts dominion over property is not shielded from liability on the basis that the action was undertaken in good faith on behalf of a third party." *Magley v M & W Inc*, 325 Mich App 307, 314; 926 NW2d 1 (2018).

Finally, we note that the trial court erred as a matter of law by automatically awarding treble damages under MCL 600.2919a. Under MCL 600.2919a, a person "may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees . . . ." Treble damages under MCL 600.2919a are intended as a penalty for the wrongful conduct that constitutes a violation of the statute, that "extend[s] beyond restoring the [victims] to their original condition.*" New Properties, Inc v George D Newpower, Jr, Inc*, 282 Mich App 120, 137; 762 NW2d 178 (2009).

However, a litigant is not automatically entitled to treble damages as a matter of right upon proving a violation of the statute. This Court has stated: "[U]nder the language in MCL 600.2912a(1), treble damages and attorney fees are discretionary. Accordingly, whether to award treble damages is a question for the trier of fact, and [this Court] cannot simply order treble damages upon a finding of conversion." *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 303 Mich App 441, 449-450; 844 NW2d 727 (2013), aff'd and remanded 497 Mich 337 (2015). However, the trial court in this case merely imposed treble damages as a matter of course simply because it determined that there was no genuine question of material fact that Bordeaux was liable for statutory conversion. This was an error of law. *Id*. Hence, the damages award as to Bordeaux is vacated and we remand the matter for trial on the issue of treble damages.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. No party having prevailed in full, no costs are awarded. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Brock A. Swartzle
/s/ Sima G. Patel